S. Leigh Savidge v. Commissioner. Elsie Savidge v. Commissioner.
S. Savidge v. Commissioner
Docket Nos. 3797, 3798.
United States Tax Court
1945 Tax Ct. Memo LEXIS 190; 4 T.C.M. (CCH) 545; T.C.M. (RIA) 45180; May 21, 1945
*190 A corporation engaged in the automobile business, from which it realized substantial profits, was liquidated and dissolved on July 31, 1941. Its principal intangible asset was a direct dealer and wholesale parts franchise. This franchise was non-transferable and terminable without notice upon dissolution of corporation. After dissolution the stockholders continued the business as a partnership and on January 16, 1942, the manufacturer approved its application for a new franchise, effective as of August 1, 1941. The stockholders included in their computation of gain from the liquidation the value of the physical and tangible assets, receivables and choses in action. Held, the respondent erred in determining that the corporation had distributed to its stockholders valuable intangibles and good will, the receipt of which had not been accounted for in their returns. H. B. Jones, Esq., and A. R. Kehoe, Esq., Coleman Bldg., Seattle 4, Wash., for the petitioners. Earl C. Crouter, Esq., for the respondent. MELLOTT
Memorandum Findings of Fact and Opinion MELLOTT, Judge: The Commissioner determined a deficiency in the income tax of each petitioner for the calendar year 1941 in the amount *191 of $11,469.96, or a total of $22,939.92. The sole question is - Did S. L. Savidge, Inc. make a distribution in liquidation to petitioners of intangible assets or good will, on July 31, 1941, in excess of the amounts reported in their returns for the taxable year? Two other issues, relating to small adjustments in connection with the Evans Finance Company, have been abandoned by petitioners. Findings of Fact Petitioners, husband and wife, are residents of the State of Washington. They filed separate income tax returns for the year 1941 with the collector of internal revenue for the district of Washington. S. Leigh Savidge (sometimes hereinafter referred to as "petitioner") has been engaged in the automobile business since 1923, principally as a distributor of standard products. In 1932 or 1933 he applied for and was granted a distributor's franchise for Dodge and Plymouth automobiles and carried on business thereunder in the city of Seattle, Washington, through a corporation until the year 1936, when its assets were distributed to him and his wife. They carried on the business as individual proprietors until June 1, 1939. On that date, S. L. Savidge, Inc. was incorporated under the *192 laws of the State of Washington and acquired the assets theretofore owned by petitioners. The corporation was liquidated and dissolved on July 31, 1941, and all of its assets were distributed to its stockholders. Petitioners, as a marital community, then owned 52 percent of its stock, and, as trustees for their two children, the remaining 48 percent. In their returns for 1941, petitioners computed the community gain resulting from the liquidation as follows: Basis
1,000 shares S. L. Sav-
idge, Inc., acquired
June 1, 1939, for sun-
dry assets
$165,000.00
480 shares transferred
by gift June 7, 1941
79,200.00
520 liquidated August 31,
1941 § 85,800.00
Received in liquidation
Sundry assets $144,827.20
Cash 24,420.75
169,248.65
Gain
$83,448.65 Each petitioner reported one-half of the gain, or $41,724.32, as a long term capital gain, and included in income 50 percentum thereof or $20,862.16. Respondent determined that S. L. Savidge, Inc. distributed to petitioners on liquidation some valuable intangible assets, the receipt of which was not included in their computation of gain, and that the capital gain each petitioner should have included in income was $47,636.23, computed as follows: Total value of tangible and intan-
gible assets distributed by the cor-
poration to its stockholders
$531,432.54
Value of the interest received as com-
munity property. 520/1000 of
$531,432.54
276,344.92
Cost of 520 shares of stock
85,800.00
Gain realized
$190,544.92
Gain to be taken into account by
community
95,272.46
Gain to be taken into account by each
petitioner
47,636.23
*193 In addition to the physical and tangible assets, receivables and choses in action, distributed to the stockholders of S. L. Savidge, Inc., and accounted for by petitioners in their returns to the extent of their proportionate shares, S. L. Savidge, Inc. had no other properties or assets except its franchise with the Dodge Division of Chrysler Motors, constituting it a direct dealer and distributor of Dodge and Plymouth cars in certain territory in the State of Washington and giving it the non-exclusive right to purchase Dodge and Plymouth parts as a wholesaler for distribution and resale within certain counties in the State of Washington; the lease to premises occupied by it at Broadway and East Union Streets in the City of Seattle; and any good will attaching to the property of its business and its conduct and operation, including dealing in new and used cars, service and repair of automobiles, and insurance and loans in connection therewith. The dealer franchise was non-assignable, terminable at will by the Dodge Division of Chrysler Motors on 90 days' notice and terminable immediately, without notice, in the event of voluntary dissolution of the holder of such franchise. Shortly *194 prior to the dissolution of S. L. Savidge, Inc., petitioner conferred with the Regional Manager of the Dodge Division, advised him of the plan to dissolve the corporation and to operate the business thereafter as a partnership, and asked whether the succeeding partnership would still be classed as a Dodge dealer. The manager told petitioner that, under the terms of the dealer franchise, there was automatic termination of the franchise on liquidation of S. L. Savidge, Inc., but if the succeeding partnership could qualify in the regular sense by furnishing a financial statement, check sheet and all the other requirements of a new dealer's application, he would submit a new agreement to the Detroit office with his recommendation for approval. He advised that he had no power to commit the Detroit office on the franchise, and that his authority was simply to investigate and recommend. After the liquidation of S. L. Savidge, Inc. the District Manager of the Dodge Division prepared the usual agreement and supporting papers for a dealer's license. They were signed by petitioner, sent to the Regional Manager for his recommendation and then sent to the Detroit office for final approval and execution. *195 It was the usual practice in a transfer of this kind for an arrangement to be made to continue the business until it could be determined whether a new franchise would be issued. After July 31, 1931, the succeeding partnership, S. L. Savidge Co., continued to sell cars without any approval of the Chrysler Corporation, so far as any agency agreement was concerned, until January 16, 1942, when a dealer agreement between the partnership and the Chrysler Corporation bearing date of August 1, 1941, was approved and forwarded to the partnership. The franchise for the sale of parts at wholesale terminated concurrently with the termination of the dealer franchise, without notice, and it was a necessary adjunct to the business of distribution of new cars. The corporation advertised extensively, its advertising expense during the years 1939, 1940 and 1941 amounting to approximately $3,000 a month. The advertising was largely devoted to advising prospective purchasers that they could secure Dodge and Plymouth cars at the corporation's place of business and the prices and terms at which such cars were obtainable. The business was carried on in a three-story leased building approximately a mile *196 and a half from the downtown business section of Seattle. Sales rooms were located on the first floor, service on the second, and repairs on the third. Situated on a hillside, the building was not ideal for a repair business apart from a sales operation. The lease had about two years to run at a monthly rental of $850, and, under the conditions existing on July 31, 1941, the value of the lease was not in excess of the rental. Prior to dissolution the corporation carried on an extensive used car business and service and repair department. The used car operation was necessary in connection with the sale of new cars; but it was not a desirable or profitable business in itself. The service and repair department was required to be maintained under the dealer agreement. A small profit was derived from its operation. Neither the petitioner, S. L. Savidge, nor any of the agents or salesmen employed by the corporation were under contract to work for, or to continue their services on behalf of, any purchaser of its business. The corporation did some insurance and loan business in connection with the sale of new and used cars. Due to the large volume of business transacted in 1940 and 1941 the *197 use of increasingly large amounts of financing became necessary. Originally this had been accomplished by straight loans from a bank, secured by chattel mortgages upon floor stocks of new cars and by pledge of conditional sales contracts covering cars sold. The maximum amount which could be secured by this method was $1,000,000. To meet the increasing needs and still comply with the bank requirements, a new plan was adopted about June 1, 1940, whereby S. L. Savidge, Inc., discounted or sold its contracts receivable to the bank. It guaranteed the bank against any loss on the purchases and handled the collections. The bank financing utilized by the corporation from June 1939 until dissolved in 1941 is indicated in the following schedule. Stoddard Motors is a trade name under which business was conducted at another show room. After June 1, 1940, a portion of the contracts, as shown in Col. III, were carried in the name of Stoddard Motors. These contracts were also guaranteed by S. L. Savidge, Inc. Col. IV
Col. I
Col. II
Col. III
Chattel
Col. V
Date
Contracts
Stoddard Motors
Mortgages
Total
June 1, 1939
$445,158.00
$275,847.00
$721,005.00
Sept. 1, 1939
549,644.00
128,600.00
678,244.00
Dec. 1, 1939
625,623.00
34,304.00
659,927.00
Mar. 1, 1940
674,105.00
287,246.00
961,351.00
June 1, 1940
775,970.53
$298,899.89
350,113.00
1,424,983.42
Sept. 1, 1940
857,486.81
336,972.39
74,100.00
1,248,559.20
Dec. 1, 1940
831,751.25
336,897.83
257,864.00
1,426,513.08
Mar. 1, 1941
976,129.77
383,638.50
549,108.00
1,908,876.27
1,129,334.62
526,611.87
404,439.00
2,060,385.49
Liquidation date
July 31, 1941
1,186,333.60
576,616.58
292,345.00
2,055,295.18
*198 The capital invested in the Savidge automobile business, * as a corporation from 1928 to 1936; as an individual business from 1936 to June 1, 1939; and as a corporation, from June 1, 1936, to July 31, 1941, was as follows: Invested Capital for
Year
Opening Balances
1928
*
1929
74,285.39
1930
78,732.96
1931
97,730.59
1932
63,193.23
1933
( 7,608.21)
1934
(10,092.75)
1935
20,233.54
1936
65,799.95
1937
139,405.90
1938
157,391.61
3-31-39 3 Months
136,874.14
8-31-39 12 Months
165,000.00
8-31-40 11 Months
182,237.84
The gross sales and gross profits for the same years, were: Year
Gross Sales
Gross Profits
1928
$1,048,996.19
$189,548.01
1929
1,126,785.86
209,830.52
1930
1,375,498.09
224,150.08
1931
1,158,705.06
228,855.22
1932
669,919.63
147,306.08
1933
1,484,445.65
222,919.35
1934
1,729,392.04
271,380.07
1935
2,275,544.99
312,668.41
1936
2,947,515.35
430,013.32
1937
2,485,540.81
328,499.02
1938
2,375,453.81
281,368.32
1939 (to 5/31)
1,718,086.06
240,484.21
9/1/39-8/31/40 *
4,486,021.79
549,344.67
9/1/40-7/31/41
6,126,261.68
803,821.48
The net income for each year, after tax was as follows: Year
Net Income
1928
$ 7,158.86
1929
16,622.06
1930
16,934.80
1931
(29,371.93)
1932
(50,853.76)
1933
(13,986.91)
1934
30,664.99
1935
54,113.78
1936
80,790.59
1937
17,991.71
1938
( 6,523.47)
1939 ( 5 months)
54,135.46
1939 ( 3 months)
17,239.84
(1939
(1940 (12 months)
55,638.84
(1940
(1941 (11 months)
129,897.74
The *199 general business outlook for automobile dealers on July 31, 1941, was not as good as during normal times because of pending and predicted credit controls and prospective curtailment of new car manufacture on account of the war. The fair market value of all assets, tangible and intangible, received by petitioners in connection with the liquidation of S. L. Savidge Inc., was not in excess of $169,248.65, the amount reported in their returns. Opinion The last finding is dispositive of the issue. The arguments of the parties and the evidence, however, may appropriately be discussed briefly. The parties agree that petitioners, under the applicable provisions of the law, were required to return, as long term capital gains, the difference between the cost or other basis of the stock and the fair market value of the assets distributed to them. Sections 111 and 115, I.R.C. They differ only as to the amount and fair market value of the intangible assets which should be included in the computation of petitioners' gain. Petitioners contend that S. L. Savidge, Inc., had no intangible assets, such as good will, over and above the physical properties, receivables, and other choses in action which *200 they reported as having been received in connection with the liquidation. They further contend that if any intangible assets existed after liquidation they had no fair market value. Respondent determined that very substantial and valuable intangible assets of S. L. Savidge, Inc., had been distributed to petitioners. His argument in support of this determination may be summarized as follows: Good will of a going concern usually has a definite value even though it may be difficult accurately to estimate or demonstrate that value. Successful operation of a business is important evidence of the value of good will; and this value may often be demonstrated by a capitalization of earnings attributable thereto. There was no actual termination of the business of S. L. Savidge, Inc., on July 31, 1941, and it continued after July 31, 1941, without any interruption. The business was large and profitable, and the intangible assets liquidated in kind to the stockholders had at least the value determined by him. He argues that such value can be tested and confirmed by the so-called capitalization-of-earnings method. Application of this method according to respondent's contention, shows that, as of *201 July 31, 1941, the good will of S. L. Savidge, Inc. had a value of $356,227.25, computed as follows: Period 1939-1941
Average net earnings
$93,589.08
Average invested capital is
$223,436.29 and figuring 10 percent
as a fair rate of return
22,343.63
Earnings attributable to intangible
assets
$71,245.45
Capitalized at 20 percent (value of
good will)
356,227.25
Petitioners concede that the good will of a going concern, if it exists, has a value. [1] *203 They insist that no valuable good will existed in their corporation, however, and point to the testimony of seven witnesses called by them. Five were automobile dealers and two were factory representatives. All were familiar with many instances involving transfers of automobile dealerships and had had personal experience with similar transactions. They testified that no payments were made for good will in any of the transactions, and each expressed the opinion that S. L. Savidge, Inc. had no good will for the reason that the primary factor in its success was the Dodge car and truck and the public acceptance of these products, based on their intrinsic merit and the general advertising by the manufacturer. They stated that the factory franchise for the sale *202 of cars and trucks, together with the correlated parts agreement, constituted the foundation of the corporation's business; pointed out that this franchise was not transferable; and adverted to the fact that a prospective dealer or transferee would pay nothing to an existing dealer or transferor on account of the latter's existing franchise because the position of the transferee would depend entirely upon what kind of a new arrangement he could make with the factory, which the transferor could not control. They testified further that the insurance and loan business and the used car, service and repair, and wholesale parts departments were mere adjuncts of the new car business and could not be carried on profitably without it. Each expressed the opinion that such a business had no good will or other similar intangible asset having a fair market value, and that this would always be true, whether the business be large or small. These witnesses, and another witness who had been engaged in the real estate business in Seattle, Washington, for thirty years, also expressed the opinion that the lease on the premises occupied by the company had no fair market value. No witness was called by the respondent and he relies almost entirely upon the capitalization-of-earnings method to prove that the S. L. Savidge, Inc. had valuable intangible assets, chiefly good will. The method used by him for demonstrating the value of intangibles has often been applied by this tribunal. See Pennsylvania Central Brewing Co., 9 B.T.A. 264; Corning Glass Works, 9 B.T.A. 771; Shanley & Furness, Inc., 21 B.T.A. 146; and Dwight & Lloyd Sintering Co., Inc., 1 B.T.A. 179. For the reasons hereinafter set out, however, its application in these proceedings is of little aid. The principal assets possessed by S. L. Savidge, Inc. at the time of its liquidation were the Direct Dealer and Wholesale Parts franchise granted to it by the Dodge Division of the Chrysler Corporation. They were, as one witness stated, the foundation of its business and responsible for its large income. These franchises were non-assignable and either party had the option to terminate them "upon not less than ninety (90) or not more than ninety-five (95) days' written notice". They were terminable immediately without notice in the event of the institution of proceedings for dissolution. *204 They gave the corporation the right to buy and sell Dodge and Plymouth cars, and parts therefor, in a specified territory. As adjuncts to this business the corporation operated used car, service and repair, and insurance departments. The only other intangible asset suggested by the respondent is good will. In In re Brown's Will, 242 N.Y.L., 150 N.E. 581, Mr. Justice Cardozo referred to this term as embracing those factors which give "a reasonable expectation of preference in the race of competition." The factor which gave S. L. Savidge, Inc. such an expectation were the franchises to sell Dodge products. Customers were attracted to its place of business because they were interested in such products. This was the general concensus of opinion of the witnesses who testified at the trial. Any good will which the corporation may have had, therefore, was created by and embodied in the franchises; and when they were lost or terminated, the good will created by them ceased to exist. Respondent stresses the fact that the agreement terminating the Direct Dealer franchise as of August 1, 1941, referred to the change as a "technical termination only" and that the "Termination [was] made for the *205 purpose of changing legal entity. Dealer changed from a corporation to a partnership." He then states that there was no actual termination of the business of buying and selling Dodge products on July 31, 1941. Both of these statements are true; but they lend little support to his determination. According to the terms of the agreement granting the Direct Dealer franchise to S. L. Savidge, Inc., it terminated "immediately by its own force without notice from either party in the event of" dissolution of the corporation, and it is not disputed that the corporation was liquidated and dissolved on July 31, 1941. The agreement also provided that, "In the event the agreement is terminated, the acceptance of orders from Direct Dealer by Dodge or the continuance of the sale of products in Direct Dealer's sales area * * * shall not be construed as a renewal of the agreement nor as a waiver of termination * * *." The important fact is that the agreement was terminated and that the stockholders of the corporation, who became the members of the succeeding partnership, did not, and could not, receive from the corporation any authorization or franchise to buy and sell Dodge products. The partnership *206 had no right to a continuation of the franchise and its members and Dodge recognized this by entering into a new agreement. The fact that several months elapsed between the liquidation and dissolution of the corporation and the execution of the new agreement, during which time the partnership continued the business of buying and selling Dodge products without any agency agreement, is an indication of the high regard Dodge had for the ability and reliability of petitioner, as a distributor. It does not, however, justify the conclusion that respondent urges, viz., that because the business was continued without interruption and no new franchise was immediately granted, the partnership must have been operating under the old franchise and petitioners should be charged with its receipt from the corporation. Our conclusion is that the large earnings of the company were attributable to the franchise to buy and sell Dodge products; that the franchise terminated on July 31, 1941; that the corporation could not and did not distribute it to its stockholders; that it had no other valuable intangibles which were distributed to them; and that the respondent erred in his determination that petitioners *207 did not include in their returns their proportionate shares of all assets, tangible and intangible, actually received by them in connection with the liquidation. Cf. Noyes-Buick Co. v. Nichols, (D.C., D. Mass.), 14 Fed. (2d) 548. Decision will be entered under Rule 50. Footnotes
*. The Dodge-Plymouth business apparently did not commence until 1933.↩
*. Figures for the period June 1, 1939, to August 31, 1939, not available.↩
1. Law of Federal Income Taxation, Mertens, Section 59.35.