## Appeal of DWIGHT & LLOYD SINTER-     Docket No. 120. ING CO., INC.

License agreements authorizing the licensees to make and use certain patented machines for refining ores, acquired for stock by a corporation, are intangible property for invested capital purposes and as such are subject to the limitation on intangibles contained in the Revenue Act of 1917.

The value of assets acquired by a corporation for stock should be determined on the basis of facts known at the time of the acquisition, or facts reasonably anticipated. Subsequent events or earnings, when reasonably anticipated, may be shown for the purpose of demonstration or corroboration of actually existing values.

Submitted October 24, 1924; decided December 18, 1924.

*Otto C. Wierum, Esq.*, for the taxpayer.

*John D. Foley, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

There are two questions involved in this appeal, both of which affect invested capital for the fiscal year ended February 28, 1917. They are whether the license agreements hereinafter mentioned are tangible or intangible property and what method should be used in determining the value of patents and license agreements at the time of the acquisition thereof for stock. The Commissioner held that the license agreements were intangible property and applied the limitation provided in the Revenue Act of 1917 in respect to such property. The Commissioner determined the value of patents and license agreements by attributing an earning power of 10 per cent to the tangible property during the period January 1, 1911, to February 28, 1915, and by capitalizing the remaining earnings on a 20 per cent basis.

### FINDINGS OF FACT.

1. Prior to March 17, 1908, and in or about the year 1906, Arthur S. Dwight and Richard L. Lloyd invented a process and mechanism for the roasting and sintering of fine ores, flue dust, and other metalliferous materials, for which inventions United States Letters Patents Nos. 882,517 and 882,518 were duly issued to them under date of March 17, 1908. Thereafter numerous other patents were issued to them or their assignees covering various improvements and developments of the above-mentioned patents, processes, and mechanisms.

2. Thereafter certain license agreements were entered into by Messrs. Dwight and Lloyd or their assignees on the one part, and various corporations engaged in the treatment of ores and metalliferous materials on the other part.

3. Under the terms of the foregoing license agreements the licensees became entitled, in consideration of the payment of the structural cost of the patented machines and the further payment of certain annual license fees or royalties based upon tonnage of material produced, to the use of such machines embodying the inventions covered by the letters patent aforesaid, and it was, among other things, expressly agreed that the title and ownership of the machines should remain in the licensors, to wit, Messrs. Dwight and Lloyd and their assignees.

4. On or about January 15, 1909, the Dwight & Lloyd Metallurgical Co. was organized under the laws of the State of New Jersey, and in consideration of the issue by such corporation to Messrs. Dwight and Lloyd of its entire capital stock of the par value of $50,000, it acquired from them the license agreements then in existence, the title to the sintering machines constructed and licensed thereunder, and the above-mentioned letters patent, together with other patents and rights to acquire patents in various countries other than the United States.

5. The number of license agreements entered into prior to the organization of the aforesaid corporation and so acquired by it as above stated was four and the number of sintering machines operated thereunder the title to which was so acquired by the corporation was six.

6. Between January 15, 1909, the date of the organization of the Dwight & Lloyd Metallurgical Co., and November 1, 1912, the number of license agreements outstanding between the said corporation and various licensees increased to 14, and the number of sintering machines operated thereunder increased to 60, besides which 14 additional machines were then under order from the same licensees but not yet installed. The names of such licensees prior to November 1, 1912, are as follows:

American Smelting & Refining Co.
Phelps-Dodge Co.
Copper Queen Cons. Mining Co.
American Metal Co.
Ohio & Colorado S. & R. Co.
Balbach S. & R. Co.
St. Joseph Lead Co.
St. Louis Smelting & Refining Co.
Tennessee Copper Co.
American Ore Reclamation Co.
Consolidated M. & S. Co. (Ltd.).
East Butte Copper Mining Co.
Mason Valley Mines Co.
Anaconda Copper Co.
International S. & R. Co.
United States Smelting, Refining & Mining Co.
Goldsmith Bros.

All of these had outstanding licenses and machines in operation or under order on the date last above mentioned.

7. On July 25, 1912, Messrs. Dwight and Lloyd caused to be organized, under the laws of the State of Delaware, a corporation under the title of the Dwight & Lloyd Sintering Co. (Inc.), which is the taxpayer in this proceeding, and thereafter and as of the date of November 1, 1912, said corporation duly acquired from the Dwight & Lloyd Metallurgical Co. the 14 license agreements then

outstanding, the 60 sintering machines operated thereunder, and all the North American patents and applications for patents covering the process and mechanism aforesaid, together with the exclusive right to enter into further agreements thereunder for the use of the mechanism and process in North America. At the same time the Dwight & Lloyd Sintering Co., Inc., also acquired certain other patents theretofore granted to and owned by third parties.

8. The authorized capital stock of said Dwight & Lloyd Sintering Co. (Inc.) was the sum of $1,000,000, and the whole of such authorized stock was issued for the following considerations:

For the license agreements, sintering machines, and patents acquired from the Dwight & Lloyd Metallurgical Co., 9,740 shares of a par value of_____ $974,000
For the patents acquired from third parties, 250 shares of the par value of_____ 25,000
For cash_____ 1,000

In addition to this the corporation took over a cash balance of $15,000 from the Dwight & Lloyd Metallurgical Co.

9. The Dwight & Lloyd Metallurgical Co. thereafter continued in business as consulting engineers and in addition retained the ownership of patents and license agreements in countries outside of North America.

10. The object of the invention, process, and mechanism covered by the patents aforesaid and accomplished thereby was to reduce to a solid and compact mass metalliferous materials, both ferrous and nonferrous, of so great a fineness (in the sense of the smallness of the particles) that they could not in their natural state and before treatment by the Dwight & Lloyd process, so called, be economically, or in the case of certain materials at all, treated by the usual smelting processes. The inventions of Messrs. Dwight and Lloyd, among other things, enabled a very large quantity of what had previously been wholly or largely waste material to be smelted and its metal contents recovered for commercial use.

11. Prior to the Dwight and Lloyd invention the usual methods were as follows: Treatment in roasting furnaces operated by hand in which the efficiency factor was only 25 pounds per square foot of hearth area per day; mechanically stirred roasting furnaces in which the efficiency factor was 125 pounds per square foot per day; the Huntington Heberlein pot process in which the efficiency factor was increased to 625 pounds per square foot per day. The Dwight and Lloyd invention resulted in a five-fold increase of the efficiency factor, viz, to over 3,000 pounds per square foot per day, and a still more favorable product. In addition, it permitted the more economical treatment of the material known as flue dust, a by-product of the iron and steel industries which previously to the Dwight and Lloyd invention had been wholly wasted although containing a large percentage of metallic matter.

12. On November 1, 1912, the invention of Messrs. Dwight and Lloyd covered by the patents aforesaid had passed beyond the experimental stage and was a demonstrated success from both the technical and the commercial and financial standpoints. From that date the volume of tonnage treated by the earlier methods above referred to steadily declined, whereas the tonnage treated by the Dwight and Lloyd methods steadily increased.

13. The growth of the tonnage treated by the Dwight and Lloyd process and machines was as follows:

From 1907 to 1909 from 0 to 40,000 tons.
From 1909 to 1910 from 40,000 to 90,000 tons.
From 1910 to 1911 from 90,000 to 350,000 tons.
From 1911 to 1912 from 350,000 to 600,000 tons.
From 1912 to 1913 from 600,000 to 1,090,000 tons.
From 1913 to 1916 from 1,090,000 to 1,660,000 tons.

The foregoing tonnage is exclusive of any tonnage treated under licenses made subsequent to November 1, 1912, and is confined exclusively to the tonnage under licenses in existence on that date.

14. The royalties earned on the foregoing tonnage in each of the years in question (and exclusive of royalties under licenses negotiated after November 1, 1912) were the following:

1908_____ $1,784.05
1909_____ 3,620.77
1910_____ 13,890.57
1911_____ 43,548.88
1912_____ 78,659.97
1913_____ 118,591.62
1914_____ 133,259.09
1915_____ 148,937.12
1916_____ 173,563.80
1917_____ 173,222.62

15. The licensees named in said 14 licenses so acquired by the taxpayer on November 1, 1912, were all large, solvent, and well-established concerns and included the largest concerns in the country then engaged in the business of smelting and refining metals. With the exceptions hereinafter mentioned, the licenses were uniform in terms and called for minimum royalties at a uniform rate. The exceptions to this statement were the American Smelting & Refining Co. license which fixed a maximum of $400,000, after paying which the licensee was wholly exempted from the payment of royalties. The $400,000 maximum was fully paid in the year 1919, of which upward of $350,000 was earned and paid after November 1, 1912. The other exceptional licensee was the American Ore Reclamation Co., which was organized by James Gayley, a former vice president of the United States Steel Corporation, for the express purpose of taking an exclusive license from the Dwight & Lloyd Sintering Co. covering the whole iron and steel field with the right to grant· sublicenses. Under this license the royalties reserved to the licensor were at a lower rate than those granted by it directly to operating companies in the nonferrous field. On November 1, 1912, the American Ore Reclamation Co. had already made sublicenses reserving royalties to the United States Steel Corporation, the Jones & Laughlin Steel Co., the E. G. Brooke Iron Co., and other large corporations.

16. On November 1, 1912, the structural cost of one of the standard 100-ton unit machines used in the Dwight & Lloyd process of treating ores was $3,500.

17. Prior to November 1, 1912, expert professional opinion contained in scientific publications of recognized authority in this country and in England had expressed itself in terms of the highest favor of the Dwight and Lloyd invention. Among other advantages incidental to the Dwight and Lloyd process was the doing away with

or minimizing the danger of lead poisoning to laborers which had accompanied the earlier methods of treatment particularly by the hand roasting process.

18. The license agreements heretofore enumerated relate to rights under patents and derive their chief value therefrom.

### DECISION.

Such part of the deficiency determined by the Commissioner as is in excess of the amount thereof, if any, which results from the valuation of both patents and license agreements acquired from stock on the basis outlined in this opinion, is disallowed. A portion of the aggregate value of patents and license agreements as thus determined should be allocated to patents and the balance of such value should be attributed to the license agreements and subjected to the limitation on intangibles prescribed by the Revenue Act of 1917. The final order determining the deficiency, if any, will be settled on consent or on seven days' notice.

### OPINION.

TRAMMELL: Both the questions involved in this appeal affect invested capital for the fiscal year ended February 28, 1917. It is contended by the taxpayer that the license agreements acquired by the corporation for the issuance of its stock were tangible property and as such should not be subjected to the limitation on intangibles paid in for stock contained in the Revenue Act of 1917. The Commissioner in adjusting the invested capital took the position that such agreements were intangible property. The taxpayer in support of its position claimed that the license agreements related to rights in tangible property, that is in machines by which the process was used, to such an extent that their value arose chiefly therefrom. If Dwight and Lloyd had had no patents upon which the license agreements were based, the value of the machines would probably have been limited to their actual cost or their replacement cost. The cost of each machine was only $3,500. Yet from one license agreement alone the taxpayer received $50,000 a year until $400,000 had been received. The right to make and use the machines was dependent upon the patent. Without the patent rights the taxpayer would have had little or no source of income. All persons would have been at liberty to make and use the process and machines without restriction and without any interference by the taxpayer. The value of the machine was small in comparison with the value of the license agreements under the patent.

When the license agreements were made the machines which were to be used were not in existence. There were no machines to lease yet the license agreements were clearly as valuable as after the construction of the machines. The licensees were given the right to use the processes and mechanism patented by Dwight and Lloyd provided they constructed their own machines, the ownership of which passed immediately to the licensors. The fact that the licensees were required to turn over the machines to the licensors added nothing over the standard cost of the machines to the cash value of the agreements. The value of the contracts rests

chiefly, if not entirely, upon the patents. Without them there could have been no license agreements of any substantial value.

The taxpayer relies upon article 811 of regulations 45 in support of its position that the license agreements were tangible property. That article of the regulations provides that most contracts are intangible property and that a contract may be regarded as tangible only after a full statement as to its exact nature and a showing to the satisfaction of the Commissioner that it relates to rights in tangible property to such an extent that its value arises chiefly therefrom. This article, however, does not support the position of the taxpayer in this case, as the license agreements do not relate to the machines to such an extent that they derive their chief value therefrom.

Patents, under the Revenue Act of 1917, are not treated as intangibles nor yet specifically as tangibles; the license agreements are one step removed from the patents. They amounted to no more than licenses in the ordinary meaning of that word or privileges to use the processes and mechanism protected by the patents. As such they are intangibles. The article of the regulations above referred to is not authority for holding that contracts or agreements which derive their chief value from *patents* are tangible assets.

The corporation made no allocation of values as between patents and license agreements when such assets were paid in for stock and the taxpayer has not claimed a value for patents separate and apart from the license agreements. Patents paid in for stock are not, for the year 1917, subject to the limitation prescribed for intangibles. A redetermination of invested capital should be made by the Commissioner in which the aggregate value of patents and license agreements determined by the application of the principles set out in this opinion should be prorated between the patents and license agreements. The limitation on intangibles should be applied to the license agreements. The Revenue Act of 1917 prescribes no limitation on patents paid in for stock other than that they can not be included in excess of the par value of stock issued therefor. The limitation on intangibles should not be applied to the value of the license agreements until that value shall have been separated from the value of the patents.

The second question is whether the value of the license agreements and patents turned over to the corporation for stock at the time of the organization of the corporation had a cash value equal to the par value of the stock issued therefor. The values of the machines and other tangible assets were accepted by the Commissioner, leaving only the question of the values of the intangibles to be determined by the Board. If such intangible assets had an actual cash value at the time they were paid in for stock that value should be included in invested capital up to the par value of the stock issued therefor, subject to the limitation on intangibles contained in the Revenue Act of 1917. The Commisioner determined the value of such intangible assets by taking the average earnings over a period of four and one-sixth years, from January 1, 1911, to February 28, 1915. These earnings were allocated by attributing to tangible assets a return of 10 per cent, and the balance was capitalized on a basis of 20 per cent. The Commissioner used the earnings for a period of approximately

three years after acquisition of said assets in ascertaining the cash value thereof as of November, 1912, when they were acquired. In determining the value of assets acquired for stock, the valuation should be based on facts known at the time they were acquired. Subsequent earnings can not be used in the determination unless from past experience or known facts such future earnings might reasonably have been anticipated. Such was the situation in this case. The taxpayer's business had passed beyond the experimental stage. The Dwight and Lloyd process and mechanism had been recognized by engineers of high standing. Leading scientific publications had contained articles which discussed and approved the process. It was then rapidly replacing the older and more crude methods of refining ores, and it was reasonably anticipated that it would entirely replace other methods in the future. It had been adopted by the leading industrial enterprises in the country engaged in the refining of ores, and they had entered into contracts to use the process for the life of the patents. If the output of ore by these companies by the use of these processes had been uniform the income could have been determined by a mathematical calculation. The taxpayer from all the facts and circumstances had reason to believe that the industrial enterprises using this process would not only increase their output generally but would increase the output from the particular machines then in use and that they would acquire other machines. It had been clearly demonstrated that by the use of these processes ores could be refined on a larger scale and with less expense than by any other method and that certain ores could be treated by this method which otherwise would have been waste material. The foregoing facts were all known at the time the corporation acquired the patents and license agreements.

The formula for determining the value of intangible assets by attributing to tangible assets a certain percentage of return over a period of years and capitalizing the balance on a reasonable percentage basis has long been recognized. As to patents the same rule is applicable. The number of years to be used over which the earnings should be averaged; the per cent to be attributed to tangible assets, and the basis of the capitalization of the remaining earnings are questions to be determined from all existing facts and circumstances. The period used should be as nearly representative as possible, so that the average earnings over it will reflect the true condition of the company.

In this case, on account of all the facts and circumstances known at the time, neither the earnings prior to the acquisition of the assets by the taxpayer nor those subsequent taken alone would accurately reflect values existing when the corporation acquired them. The Commissioner recognized this fact and used a period prior to November 1, 1912, and a period subsequent thereto. The subsequent earnings could be, and were, reasonably anticipated. The earnings over a reasonable period after the acquisition of the patents and license agreements merely corroborated facts already known. In a court of law what is a reasonable period over which to average the earnings is a question of fact to be determined by the jury.

We are convinced from a consideration of all the facts that a period beginning January 1, 1911, and ending February 28, 1916, would be a more representative period, and would more accurately

reflect the actual cash values of the assets than the four and one-sixth years ending February 28, 1915, used by the Commissioner.

In view of the known stability of the business of the taxpayer with reference to its earning power it is the opinion of the Board that the value of its patents and intangible assets taken together should be determined by attributing to tangible property a return of 8 per cent and capitalizing the balance of the earnings on the basis of 15 per cent instead of by attributing 10 per cent to tangible assets and capitalizing the balance of the earnings on a basis of 20 per cent as was done by the Commissioner.

The Board has no evidence before it of the amount of the net earnings for the entire period over which they should be averaged as the basis for the determination and has no evidence of the value of patents separate and apart from the license agreements. For that reason no determination of values can be made by the Board. The appeal will be retained in the jurisdiction of the Board until by stipulation or upon rehearing, if necessary, the facts essential to a determination of these matters are submitted.