JOHN MCSHAIN AND MARY MCSHAIN, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4767–74, 9649–75.    Filed March 14, 1979.

*John F. Kennedy* and *Charles V. Stoelker, Jr.*, for the petitioners.

*Howard W. Gordon*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|------------|
| 1967 | $654,059.86 |
| 1969 | 52,706.03 |
| 1970 | 1,685,711.49 |

Most of the issues have been settled, conceded, or previously decided by this Court. *McShain v. Commissioner*, 68 T.C. 154 (1977); *McShain v. Commissioner*, 65 T.C. 686 (1976). The issue remaining for decision is whether a second leasehold mortgage note had an ascertainable fair market value in 1970 for purposes of determining whether there was a gain on a sale within the meaning of section 1001, I.R.C. 1954.[1] In view of our resolution of such issue, we need not decide whether such note was the equivalent of cash.

### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

The petitioners, John and Mary McShain, husband and wife, maintained their mailing address in Philadelphia, Pa., at the time they filed their petitions in this case. They filed their joint Federal income tax returns for 1967, 1969, and 1970 with the District Director of Internal Revenue, Philadelphia, Pa. During the years in issue, the petitioners maintained their books and records by use of the cash method of accounting.

During 1950, Mr. McShain acquired an 85-percent interest in a tract of real estate in Washington, D.C. (the Washington property). In 1967, the United States of America condemned such property and awarded Mr. McShain $2,890,000 for the loss of his

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

interest therein. The realized gain attributable to such condemnation was $2,616,000.

To avoid recognition of such gain, the petitioners elected to invoke section 1033(a)(3). Such election was made in an express statement attached to their 1967 Federal income tax return, in which the petitioners indicated they would timely reinvest the condemnation proceeds in qualified property.

During 1967, Mr. McShain investigated the possibility of building a large hotel in the Philadelphia area. After conducting a feasibility study, he obtained construction financing from the Philadelphia National Bank to build the hotel. On November 30, 1967, Mr. McShain filed a mortgage loan application with Penn Mutual Life Insurance Co. (Penn Mutual) to secure the permanent financing for the hotel. Subsequently, in December 1967, Mr. McShain obtained two loans from Penn Mutual totaling $8 million, and he executed two notes and a mortgage securing such notes. The first loan was for $6 million and was evidenced by a $6 million nonrecourse note, i.e., the holder of the note could only proceed against the property securing the note in the event of a default. The second loan was for $2 million and was evidenced by a $2 million full recourse note, i.e., the holder of the note could proceed against Mr. McShain personally, as well as the property securing the note, in the event of a default. One of the conditions for approval of the loan was that there be no secondary financing of the mortgaged premises.

During 1968, the petitioners reiterated their prior election in a letter to the District Director, Philadelphia, Pa., in which they sought an extension of time for completion of the replacement building. An extension was granted, giving the petitioners until December 31, 1969, to complete construction. Within the extended replacement period, the petitioners reinvested the condemnation proceeds.

The replacement property was a 22-story hotel constructed by Mr. McShain's wholly owned construction company, John McShain, Inc. The hotel was operated as a Holiday Inn (the Philadelphia Inn) under a franchise license from Holiday Inns of America. The construction costs of such property were as follows:

| | |
|---|---:|
| Building ........................................ | $6,548,275 |
| Elevators ...................................... | 382,972 |
| Furniture and fixtures .................... | 1,825,968 |
| Total ...................................... | 8,757,215 |

The Philadelphia Inn was constructed on property owned by Country Club Estates, Inc. (Country Club), which was wholly owned by Atlantic City Ambassador Hotel Corp., which in turn was 95-percent owned by Mr. McShain. On November 24, 1969, Mr. McShain entered into a lease agreement with Country Club for a term of 35 years. Such lease also provided that Mr. McShain was required to pay annual rental of $64,000, to complete a building that would be used for hotel or motel purposes, to keep the building in good repair, to pay taxes, assessments, and utility bills, and to obtain Country Club's approval prior to subletting the premises. Upon breach of the lease, Country Club could, at its option, demand that Mr. McShain pay immediately, as liquidated damages, the rent due for the entire unexpired term of the lease.

On December 30, 1969, Mr. McShain entered into a contract with Harry B. Helmsley for the sale of his leasehold interest in the Philadelphia Inn. The stated purchase price was $13 million and was payable as follows: (1) $200,000 paid by the purchaser upon execution of the contract; (2) $1,800,000 paid by the purchaser at the closing; (3) $8 million by the purchaser taking subject to the first mortgage held by Penn Mutual; and (4) the balance by the purchaser (or his assigns) making, executing, and delivering a nonrecourse note (the note) in the amount of $3 million secured by a second leasehold mortgage. Mr. Helmsley assigned his interest in the contract to City Line & Monument Corp. (City Line), a corporation indirectly wholly owned by him.

City Line executed the note and the leasehold mortgage, and the sale of the leasehold interest to City Line was consummated on March 10, 1970. The note provided for constant monthly payments of $22,500, commencing May 1, 1970, and ending on March 1, 1985, when the remaining principal of the note would become due. Each monthly payment was to be applied first to interest at the rate of 7½ percent per annum on the reduced principal balance and then in reduction of the principal amount of the loan. On March 1, 1985, the remaining balance of the leasehold mortgage note would be $1,825,905.79. In addition, Mr. McShain as-

signed his interest in the lease with Country Club to City Line, and then Country Club and City Line amended the lease to provide, inter alia, for a 50-year term.

About the same time that City Line acquired the Philadelphia Inn from Mr. McShain, another assignee of Mr. Helmsley acquired the Atlantic City Holiday Inn from a corporation controlled by Mr. McShain. The stated purchase price of $12 million was to be paid as follows: (1) $200,000 paid by the purchaser upon execution of the contract; (2) $2,440,000 paid by the purchaser at the closing; (3) $4,301,318.12 by the purchaser taking subject to a first mortgage; and (4) $5,058,681.88 by the purchaser making, executing, and delivering a purchase-money note secured by a second mortgage.

On their 1970 Federal income tax return, the petitioners reported the gain from the sale of Mr. McShain's leasehold interest in the Philadelphia Inn on the installment method of accounting under section 453. They reported the selling price as $13 million, and the only payment received by them in 1970 as $2,011,320.46. Despite their election under section 1033 to defer recognition of gain on the condemnation of the Washington property in 1967, the petitioners neglected to reduce their cost basis in the replacement property by the amount of the unrecognized gain as required by such section. After making appropriate adjustments for depreciation and sales tax deductions, and after reducing the basis of the replacement property by the nonrecognized gain under section 1033, the petitioners' adjusted basis in the leasehold interest at the time it was sold to City Line was $5,633,611.46.

In 1971, Mr. McShain was apprised by his accountant of the alleged error concerning the failure of the petitioners to reduce the basis of the Philadelphia Inn by the gain not recognized under section 1033. However, no action was taken with respect to this matter prior to the time that the Commissioner audited the petitioners' returns for 1969 and 1970.

In his notice of deficiency, the Commissioner determined that the petitioners must reduce their basis in the replacement property by $2,616,000 (the amount of the unrecognized gain under section 1033), that $2,281,929.24 (the amount by which the mortgage on the replacement property exceeded their basis) must be included as an additional payment received by them in 1970, and that, therefore, they were not entitled to report the gain on the

sale of the Philadelphia Inn by use of the installment method since their first-year payments exceeded 30 percent of the selling price.

Thereafter, upon advice of counsel, the petitioners sought to revoke their prior election under section 1033. In *McShain v. Commissioner*, 65 T.C. 686, 693 (1976), we held that the petitioners' attempt to revoke their section 1033(a)(3) election was untimely. We specifically noted, however, that an issue not presented at that time was whether the replacement property qualified as "property similar or related in service or use" to the condemned property.

Still wishing to avoid the effect of the basis adjustment under section 1033(c), the petitioners filed a motion for summary judgment arguing that the replacement property was not a qualified replacement for the condemned Washington property and that, therefore, the petitioners' section 1033 election was invalid. In *McShain v. Commissioner*, 68 T.C. 154 (1977), we held that under section 1033(a)(3) and (g) the replacement property was "similar or related in service or use to the" Washington property.

## OPINION

In this case, the issue to be decided is whether in 1970, the note had an ascertainable fair market value within the meaning of section 1001(b). If we find that the note had such value, it would then be necessary to decide the amount of such value. The Commissioner argues that the note was worth its face amount of $3 million; alternatively, he argues that the minimum fair market value of the note was $1,425,000. On the other hand, the petitioners maintain that the value of such note is not ascertainable; alternatively, they take the position that if the value of the note is ascertainable, they are entitled to elect to use the installment method for reporting the gain on the sale of the Philadelphia Inn. In view of our conclusion concerning the fair market value of the note, we do not reach the petitioners' alternative position, and we express no opinion as to their right to use the installment method.

Section 1002 provides that "Except as otherwise provided in this subtitle, on the sale or exchange of property the entire amount of the gain or loss, determined under section 1001, shall be recognized." Section 1001(a) provides, inter alia, that gain from the sale or other disposition of property shall be the excess

of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain. Section 1001(b) provides in pertinent part that "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

In determining the amount realized, the fair market value of the property received, in this case a note, must be ascertained, if possible. As a general proposition, the price at which a willing buyer will purchase property from a willing seller, when neither party is acting under compulsion, and both parties are fully informed of all the relevant facts and circumstances, establishes fair market value. *Bankers Trust Co. v. United States*, 207 Ct. Cl. 422, 518 F.2d 1210, 1219 (1975), cert. denied 424 U.S. 966 (1976); *Staley v. Commissioner*, 41 B.T.A. 752, 769 (1940); *Newberry v. Commissioner*, 39 B.T.A. 1123, 1129 (1939). If such value is ascertainable, then the transaction is deemed "closed," i.e., the taxpayer must compute his gain or loss based in part upon the value of the note; such value then becomes the taxpayer's basis in the right to future payments under the note, and if such payments exceed such anticipated value, then the excess is treated as ordinary income. If the value of the note is not ascertainable, then the transaction is left "open," i.e., the taxpayer need not report any gain until the amount actually received by him exceeds his basis, and such excess is entitled to capital gains treatment if the sale qualifies for such treatment. See *Burnet v. Logan*, 283 U.S. 404 (1931); *Miller v. United States*, 235 F.2d 553 (6th Cir. 1956).

Whether property has an ascertainable fair market value and the amount of such value present questions of fact to be resolved on the basis of all of the facts and circumstances in the case (*Riss v. Commissioner*, 368 F.2d 965 (10th Cir. 1966), affg. a Memorandum Opinion of this Court; *Campagna v. United States*, 290 F.2d 682 (2d Cir. 1961); *Miller v. United States, supra*); but it is also true that in only rare and extraordinary circumstances will property be considered not to have an ascertainable fair market value. Sec. 1.1001-1(a), Income Tax Regs. In *Warren Jones Co. v. Commissioner*, 60 T.C. 663 (1973), revd. 524 F.2d 788 (9th Cir. 1975), this Court was called upon to determine whether a real estate contract which provided for the deferred payment of the purchase price for certain real estate was to be included in

the taxpayer's amount realized under section 1001(b) for purposes of determining gain. In a Court-reviewed opinion, we held that the transaction remained open because the real estate contract could not be considered the equivalent of cash. On appeal, the Court of Appeals for the Ninth Circuit rejected our reliance on the cash equivalency doctrine and held that the real estate contract had an ascertainable fair market value and that such value had to be included in the taxpayer's amount realized. 524 F.2d at 791–794. However, the Ninth Circuit recognized that under some circumstances, value cannot be ascertained. 524 F.2d at 794, and the cases cited therein. In view of our holding with respect to whether the note had an ascertainable fair market value, we need not deal with, and we express no opinion regarding, the issues presented in *Warren Jones.*

To establish whether the note had an ascertainable fair market value, and if so, the amount thereof, both parties presented the testimony and evaluation reports of expert witnesses.

The petitioners' first witness was a highly qualified financial expert with nearly 30 years of experience in financial matters, including financing of accounts receivable, inventories, equipment, and real estate mortgages. During his career, he had originated second mortgage financing for the account of his employers or brokered second mortgages for others in *hundreds* of transactions. The petitioners' second witness was also eminently qualified in financial matters. He was an investment banker for 20 years, and in such capacity, he had valued corporations and corporate securities, managed relatively large public offerings, participated in corporate mergers and acquisitions, and placed equity in real estate tax shelters. Though he never placed or brokered second mortgages, second mortgage financing was an integral part of many of his financial transactions.

In the opinion of the petitioners' witnesses, the note had no ascertainable fair market value.[2] In reaching such conclusion, they relied upon the following factors: (1) The Philadelphia Inn's occupancy rate was only 57.5 percent for the first 9 months; (2) for the period June 11, 1969, to December 31, 1969, the Philadelphia Inn had a net loss of $747,212, and a net loss of $168,844 for January 1, 1970, to March 2, 1970; (3) the cash flow from operat-

---

[2]Though the petitioners' experts testified that the note had a zero fair market value, it is evident from the testimony that they meant the note had no ascertainable fair market value. This interpretation is consistent with the parties' interpretation of such testimony.

ing the property for 9 months prior to the sale was inadequate to service the first mortgage; (4) the actual operations of the Philadelphia Inn were too brief to warrant a reliable prediction as to future income; (5) the normal term for second mortgage financing is generally 3 to 7 years, whereas here, the term of the note was 15 years; (6) there was no personal guarantee or surety backing up the obligation; (7) the first mortgage commitment prohibited secondary financing; (8) the lease between Mr. McShain and Country Club, which was assigned to City Line, may have been a lien on the leasehold which was prior to the second leasehold mortgage; (9) the note and the second leasehold mortgage did not appear to give the holder the right to cure defects by senior obligors; (10) the note was an illegal investment for fiduciary and institutional investors; (11) in their opinion, the fair market value of the collateral was insufficient to secure both mortgages; (12) the 7½-percent interest rate on the obligation was far below the interest rate normally associated with secondary financing; (13) City Line was thinly capitalized with no apparent established record of earnings; (14) the first and second mortgages exceeded acceptable levels of financing in terms of the value of the leasehold interest; and (15) there was no market for the note.

The Commissioner also presented the testimony of two experts, who worked together in valuing the note. Though neither of them had ever placed or brokered second mortgages, both were highly qualified real estate appraisers and very familiar with financial markets involving real estate. Such experts took a two-pronged approach in valuing the note. First, they conducted an income analysis of the Philadelphia Inn to determine the net stabilized cash flow available for payment of the note. Such income was then capitalized to determine that the fair market value of such property was $10,935,000. Second, they investigated the marketplace to determine whether, in view of their valuation of the Philadelphia Inn, the note was marketable, and if so, for how much. They agreed with the petitioners' experts that the following factors negatively influenced value: (1) Absence of a personal guarantee or suretyship; (2) the 15-year term of the note; (3) the limited market for second mortgages because it was an illegal investment for institutional buyers and because individual investors and real estate brokers were generally not interested in it; (4) the 7½-percent interest rate was far below

the rate usually associated with secondary financing; and (5) there was no established income pattern for the hotel since it was a new operation. Nevertheless, in their view, the fair market value of the property securing the note was adequate to guarantee the marketability of the note and to support a fair market value of $1,425,000 for the note.

We are impressed with the credentials and the opinions of all the experts. Nevertheless, we think there are flaws in the income analysis of the Commissioner's experts. In addition, we are convinced that because of the speculative nature of the underlying collateral, because of the absence of a market for the note, and because of the other factors negatively influencing value, the fair market value of the note could not be ascertained in 1970. See, e.g., *Miller v. United States, supra; Liftin v. Commissioner*, 36 T.C. 909 (1961), affd. 317 F.2d 234 (4th Cir. 1963); *Miami Beach Improvement Co. v. Commissioner*, 14 B.T.A. 10 (1928); *Joliet-Norfolk Farm Corp. v. Commissioner*, 8 B.T.A. 824 (1927).

In determining the projected income of the Philadelphia Inn, the Commissioner's experts relied upon a report entitled "Trends in the Hotel/Motel Business," prepared by Harris, Kerr, Forster & Co. (the Harris report), recognized experts in the hotel/motel business. The Commissioner's experts used the same method as was used by the Harris study to compute the average 1969 income for motels and motor hotels with restaurants (hotels), taking into account size, average occupancy, average daily room rate, and geographical location. The following chart compares the occupancy rate and average room rate used by the Commissioner's experts with the rates in the Harris report for four applicable categories of hotels:

| Category | Percent occupancy | Average room rate |
|---|---|---|
| Commissioner's experts | 65.0 | $21.00 |
| All hotels | 74.1 | 15.16 |
| Hotels in New England and Mid-Atlantic States | 80.2 | 19.02 |
| Hotels with rates over $15 | 77.6 | 18.64 |
| Hotels with over 200 rooms | 77.2 | 17.54 |

The occupancy rate assumed by the Commissioner's experts exceeded the actual experience of the Philadelphia Inn during

its 9 months of operation before the sale, although their assumed rate was less than the averages set forth in the Harris report. However, the Commissioner's experts assumed an average room rate in excess of those reflected in the Harris report. The hotel business is a service industry in which a reputation for quality service is essential to a profitable operation; but the Philadelphia Inn was a new business enterprise without an established business reputation in the community. To the contrary, during the first 9 months of operation, there had been a structural failure in the parking garage, and there were many defects in design which collectively had "a significant impact on the competitive desirability of the property." Moreover, questions had been raised about the quality of the management, and its 9-month track record revealed an occupancy rate well below normal and substantial losses. Finally, the Philadelphia Inn faced a stiff competitive challenge from a Marriott Hotel which was located across the street and which had just expanded from 420 to 736 rooms. Even the Commissioner's experts acknowledged that the Philadelphia Inn was "less appealing than the Marriott Hotel." In our view, a knowledgeable investor conducting an income analysis with these factors in mind would have used a very conservative occupancy rate and certainly would not have used an average daily room rate of $21 when such rate was nearly $2 more than the most favorable average daily room rate in the Harris report.

In addition, we have serious questions about the method of computing the total revenues of the Philadelphia Inn used by the Commissioner's experts. First, they computed room revenues using hypothetical room rates and occupancy rates. Then, based on the experience of the Philadelphia Inn during the 9 months preceding the sale, they determined that food revenues were 95 percent of room revenues and that beverage revenues were 40 percent of food revenues, and they used such ratios to project the future income of the hotel. However, according to the Harris report, food revenues averaged only 49 percent of room revenues and beverage revenues averaged only 39 percent of food revenues. Furthermore, since it appears that they inflated room revenues, the use of such ratios has the effect of also inflating the revenues from food and beverages. As a result, the ratio between the food and beverage revenues and total revenues as

computed by the Commissioner's experts far exceeds the ratios in the Harris report.

In our judgment, the evidence also convincingly establishes that the note was not marketable. Both of the petitioners' experts testified that there was no real market for the note.[3] The Commissioner's experts recognized that the many factors relied upon by the petitioners' experts did negatively influence the value of the note; but they felt, based on the income analysis, that an investor with substantial risk capital could be coaxed into buying the note if the rate of return were high enough. However, in our opinion, the income analysis of the Commissioner's experts is far to speculative to induce an investor to purchase the note despite the many deterrents to such an investment. Morever, neither of the Commissioner's experts had ever bought, sold, or brokered second mortgage notes, so they contacted four persons in the community who dealt with such securities to determine if the note was marketable. Though the testimony is somewhat ambiguous on this point, two of such persons seemed to indicate the note might be marketable, and the other two indicated it would not be marketable. In addition, the experts in the community canvassed by the petitioners' expert stated without qualification that the note was not marketable. Accordingly, we hold that for purposes of section 1001, the note had no ascertainable fair market value in 1970.[4]

The Commissioner also argues that "For tax purposes, the $3 million second mortgage note must be reported at face" because "The petitioners used the $3,000,000 figure in their original return," because "The respondent has demonstrated heretofore in his analysis of the Holiday Inn in Atlantic City transaction, that a similar note was valued by the petitioner at face," and because "John McShain failed to turn square corners with the Government inasmuch as he was apprised in 1971 of his failure to re-

---

[3]One of such experts did admit that a speculator might purchase the note for a token payment, such as 5 percent; yet, such a possibility does not indicate that there was anyone in the marketplace who would have been willing to purchase the note for a substantial price.

[4]The effect of such holding is that the transaction remains open, and any gain ultimately realized by Mr. McShain must be recognized when realized. Yet, we recognize that for purposes of applying some provisions of the internal revenue laws, it is necessary to compute the tax consequences of a transaction when it occurs, and in those situations, we must determine a fair market value in the best available manner; for example, such value may have to be determined where there has been a contribution of property to charity (*Silberman v. Commissioner*, T. C. Memo. 1973–48), and where there has been a testamentary or inter vivos gift of property (*Dibble v. Commissioner*, 6 B.T.A. 732 (1927)).

duce the basis of the Holiday Inn on City Line by the gain not recognized per section 1033 and took no action to cure this error." We find no merit in such contentions.

It is well settled that the valuation of an asset in a tax return is an admission against interest by the taxpayer when such valuation is inconsistent with a subsequent position taken by him. *Waring v. Commissioner*, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam a Memorandum Opinion of this Court; *Grill v. United States*, 303 F.2d 922, 926 (Ct. Cl. 1962); *Campagna v. United States*, 290 F.2d 682 (2d Cir. 1961); *Marsack's Estate v. Commissioner*, 288 F.2d 533, 536 (7th Cir. 1961), affg. a Memorandum Opinion of this Court. It is equally well settled that such admission is not conclusive and that the trier of fact is entitled to determine, based on all the evidence, what weight, if any, should be given to the admission. *Waring v. Commissioner, supra; Estate of Kreis v. Commissioner*, 227 F.2d 753 (6th Cir. 1955), affg. a Memorandum Opinion of this Court; *Roche v. Commissioner*, 63 F.2d 623, 624 (5th Cir. 1933), affg. 21 B.T.A. 1139 (1931); *Bedell v. Commissioner*, 30 F.2d 622, 625 (2d Cir. 1929), affg. 9 B.T.A. 270 (1927).

Based on the evidence, there can be no dispute that the note was not worth $3 million. Even the Commissioner's experts discounted the note in excess of 50 percent of its face amount. In addition, when the petitioners reported the sales price as $13 million and the note at its face amount of $3 million in connection with the election under section 453, the value of the note was irrelevant from their perspective. They believed that they were entitled to report the gain under the installment method; thus, under their view, even if the note was worth $3 million, they were required to report only a part of the gain on the sale in 1970.

With respect to the note involved in the Atlantic City Holiday Inn transaction, the record contains very little information about the particulars of such transaction. The available evidence suggests that there may have been significant differences between the two transactions. On the basis of this record, we cannot conclude that the Atlantic City Holiday Inn transaction is probative of the value of the note at issue here.

Finally, the Commissioner's allegation that the petitioners "failed to turn square corners" is not the least bit dispositive of the issue involved herein. It is quite apparent that the petition-

ers' representatives erred in failing to adjust the basis of the Philadelphia Inn in light of the petitioners' election in 1967; yet, the consequences of such action were not altogether clear. It took three opinions of this Court to ferret out all of the facts, to categorize the transactions, and to characterize their tax implications. Many of the factors relied upon by the Commissioner to establish the petitioners' alleged absence of good faith were subjects of this protracted litigation. If the Commissioner were convinced that the petitioners' conduct was questionable, his remedy was not to ask this Court to ignore the facts in this case and to find a value of the note not based on such facts, but to seek additions to tax under either section 6653(a) or (b). Accordingly, the Commissioner's alternative argument is rejected.

*Decisions will be entered under Rule 155.*