SOL SCOPE, ET AL., Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent [1]
Scope v. Commissioner
Docket Nos. 5998-72, 5999-72, 6854-72, 3850-74, 3862-74, 4015-74, 5668-76, 5671-76, 5799-76.
United States Tax Court
T.C. Memo 1980-493; 1980 Tax Ct. Memo LEXIS 91; 41 T.C.M. (CCH) 304; T.C.M. (RIA) 80493; October 30, 1980, Filed *91 Harry Margolis,Ben Margolis, and Sol Scope for the petitioners. James M. Kamman and John E. Lahart for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: In these consolidated cases respondent determined deficiencies and additions to tax under section 6653(a), I.R.C. 1954, [2] for the years and in the amounts as follows: Deficiencies
Additions to Tax
in
I.R.C. 1954
Petitioners
Year
Income Tax
Section 6653(a)
Sol Scope
1969
$4,260.22
$213.01
Sol Scope and
1970
2,883.00
144.00
Nina Scope
1971
4,225.00
211.00
1972
20.0
1.00
William G. Smith and
1969
4,421.53
221.08
Carol K. Smith
1970
2,836.79
141.84
1971
4,536.00
197.00
1972
1,177.00
59.00
Neil M. Herring
and
1969
935.41
46.77
Ethel Herring
1970
1,953.98
97.70
1971
5,335.78
266.79
1972
875.16
43.76 Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only the fair market value on December 31, 1969, of a piece of unimproved property referred to as the Sunset Hills property. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. All *92 of petitioners resided in Los Angeles County, California, at the time of the filing of their petitions in this case. Sol Scope filed an individual Federal income tax return for the calendar year 1969. Sol and Nina Scope filed joint Federal income tax returns for each of the calendar years 1970, 1971 and 1972. William G. and Carol K. Smith filed joint Federal income tax returns for each of the calendar years 1969, 1970, 1971 and 1972. Neil M. and Ethel Herring filed joint Federal income tax returns for each of the calendar years 1969, 1970, 1971 and 1972. William G. Smith, Sol Scope, and Neil M. Herring (petitioners) were attorneys. They shared the same office address in Los Angeles, California, and were professionally associated with Harry Margolis. On or about September 25, 1969, petitioners formed a partnership entitled "SSH Investments" (SSH). The partnership agreement stated that the partnership was formed to conduct a general investment business with an emphasis on the acquisition and development of real estate. SSH timely filed a Form 1065 with the Internal Revenue Service for each of the years 1969, 1970 and 1971. On December 10, 1969, SSH entered into an agreement *93 with Aruba Bonaire Curacao Trust Company Limited (ABC), a Bahamian trust company, to purchase certain real property which consisted of a 15-acre tract of land (the "Kuwabara" property) and approximately 40 acres of land (the "Sunset Hills" property), both of which were located in Santa Clara County, California. The agreement stated that the purchase price was $425,000 plus the assumption of all outstanding deeds of trust on the properties and that SSH was entitled to possession on January 1, 1970. As of the date of the agreement, ABC did not own the properties but it did acquire the properties on December 30, 1969, from Santa Clara Investors which was a partnership consisting of investors represented in part by Harry Margolis. Prior to 1966, the property had been transferred between a number of entities. In 1959, Trojan Construction Company acquired the Sunset Hills property and in 1960 acquired the Kuwabara property. At that time, the company was owned by Thomas C. McMillan, a client of Harry Margolis. Trojan Construction Company deeded the property to E. C. Johnson, Mr. McMillan's son-in-law, in the early 1960's. On March 13, 1963, Mr. Johnson deeded the property pursuant *94 to a holding agreement to Metro Properties Company (Metro) and except as hereinafter set forth record title remained with it until January 1, 1973. Thereafter, the property was transferred by Mr. Johnson to Arawak Trust Company Ltd., a Bahamian entity, and then from Arawak to World Minerals N.V., a Netherland Antilles corporation. On or about January 1, 1966, World Minerals N.V. transferred certain Santa Clara County properties, including the Kuwabara and Sunset Hills properties, to Santa Clara Investors. On its record of journal entries for December 1969, SSH recorded the purchase of the property from ABC by assigning the Kuwabara property a value of $284,720 and the Sunset Hills property a value of $174,506. The offsetting credits were listed as a note payable to ABC for $300,000 and loans payable to the Palo Alto Savings and Loan Company of $104,848, $53,876, and $501. On its record of journal entries for 1971, SSH, on September 30, increased the value of the Sunset Hills property by $192,098 and in turn reduced the value of the Kuwabara property by $67,098 and credited $125,000 to a note payable from ABC. It was explained below this entry that it was made to correct an error *95 made in the original entry of December 1969. While SSH owned the Sunset Hills property, a number of transfers were made with respect to it. On August 20, 1970, a corporation grant deed was recorded whereby Metro, as the holding company, transferred the Sunset Hills property to Sol and Nina Scope.On August 21, 1970, Sol and Nina Scope executed a grant deed which transferred approximately 2.5 acres of land which bisected the Sunset Hills property to the City of San Jose and in consideration thereof, the city agreed to pay the real property taxes and construct a roadway, together with improvements, on the deeded property. The city was given a slope easement on either side of the deeded property, which consisted of.84 acres and.56 acres, respectively. On the same day, the remaining property was deeded back to Metro by Sol and Nina Scope. On December 14, 1971, SSH transferred its interest in the Sunset Hills and Kuwabara properties to the Anglo Dutch Capital Company (ADC). At that time, ADC was a California corporation whose stock was owned 50 percent by Harry Margolis and 50 percent by an employee of Mr. Margolis. On December 31, 1971, ADC transferred its interest in both pieces *96 of property to Sunset Hills Associates, a California partnership comprised solely of clients of Harry Margolis. On the SSH partnership return for 1971, the sales price of the property was listed as $530,944 and the adjusted basis of the property as $533,414 for a loss on the sale of $2,470. The Sunset Hills property is located in the foothills to the east of San Jose, California. It consisted of 40.954 acres which was grassland used for pasture in 1969. The property remained undeveloped at the time of the trial of this case. The property slopes upward in an easterly direction from an elevation of about 350 feet to about 650 feet in the northeast corner and the shape of the parcel is regarded as irregular. The property immediately to the west of Sunset Hills was subdivided by Trojan Construction Company, which was the owner of the subject property in the early 1960's. At that time, the City of San Jose had approved a tentative subdivision map for the subject property which allowed 1.9 dwelling units per acre. This tentative map expired on December 8, 1965, and no further applications for subdivision were made through January 1, 1972. The adjacent property uphill and to the east *97 of Sunset Hills is called the San Jose Highlands (Highlands). Subdivision of the Highlands was begun in March 1962 by James Claitor, a realtor. The Director of Public Works recommended against the development but the plans were approved by the San Jose City Council. The basis for concern was that a large portion of this property was located on an ancient landslide. A soils investigation and report was subsequently completed in July 1962 which indicated that the property was in fact located on a landslide and that the area showed signs of current landslide activity. After Mr. Claitor had partially developed the area, the landslide problem became very apparent. A landslide occurred in 1967 along Boulder Drive, which at that time was the only road which provided access to the Highlands. Active movement of this slide apparently started in 1967 with the disruption of the pavement on the higher end of Boulder Drive near the Suncrest Avenue intersection. Water lines were also broken at several places along the road. A City of San Jose memorandum dated March 24, 1969, identified three distinct areas of failure along Boulder Drive. The movement which had been noted in 1969 increased *98 in the early months of 1970 with damage to Boulder Drive and numerous breaks in the water lines in the area. This 1970 landslide proved to be the most destructive in the Highlands. It formed an elongated mass approximately 700 feet in length and about 300 feet wide which extended across the lower end of Boulder Drive near Claitor Way. The movement continued in January 1971 following a period of unusually heavy rainfall during the last few months of 1970. After that period it became apparent that the movement of the slide increased following periods of heavy rainfall and that this would result in further disruption of pavement, breakage of water lines, and damage to structures located on the slide. A report written by the Santa Clara County Assessor's Office estimated that the loss in market value for all houses in the Highlands was $228,000, the loss in value for lots was $195,000, and the loss in value of homes which suffered specific landslide damage was $61,520, for a total loss in the Highlands of $484,520. The San Jose Department of Public Works reported that the city had paid out $210,500 for maintenance, soils studies and consulting fees in the Highlands area. Pacific *99 Gas and Electric reported that the damage to gas lines totaled $20,000 by late 1970. Damage to water lines increased steadily over the years as indicated by the fact that 1 repair of $215 was required in 1967-1968 and 20 repairs costing $5,816 were required in 1970-1971 with total repair costs amounting to $9,261 for the period. In order to prevent further damage and contrary to the general practice in California, the utility lines were subsequently placed above ground. Due to the continual maintenance of Boulder Drive which was necessitated by the landslide activity over the years, the City of San Jose began to consider relocation of the street. The city hired the firm of Gribaldo, Jacobs, Jones and Associates (Gribaldo) to submit a report on the feasibility of relocating the lower portion of Boulder Drive. The report indicated that if the road was merely realigned it would still remain on a landslide ranging from 12 to 40 feet in depth in which surface movement was still occurring. As a result, the city decided that in order to provide access to the Highlands it would extend Suncrest Drive and abandon the lower portions of Boulder Drive. At the time of trial, the lower portion *100 of Boulder Drive was completely impassable due to severe slumping and sliding of the earth. Gribaldo submitted a report to the city entitled "Roadway Feasibility Investigation for Proposed Extension of Suncrest Drive" in May 1969. The report stated that a field and laboratory investigation had been conducted based on 15 test borings along the proposed roadway, 6 of which were on the Sunset Hills property. Test borings 1 through 3 drilled on the subject property revealed that the soil was of a variable clayey nature and that numerous variable rock types were also encountered within the clay matrix. This indicated that the soil was part of a landslide mass and that the landslide had probably occured over 100 to 200 years ago. Test boring 3 was drilled to a depth of 70 feet but did not pass through the slide debris, indicating an unusually thick and deep slide mass. The three other test borings drilled on the subject property passed through the slide mass and encountered highly weathered serpentines, a greenish to bluish-green rock that is highly sheared and has been locally altered to soft clay-like material, at a depth of approximately 40 feet. The remaining test borings drilled *101 along the higher ground of the proposed Suncrest Drive extension encountered in-place intrusive serpentine rocks at the surface or within 25 feet of the surface. This indicated that a portion of the old slide mass which had previously covered that area had probably been eroded away, leaving some prominent rocky knobs exposed. Subsurface water was encountered at depths varying from 7 to 25 feet below the ground in most of the test borings and the water levels rose appreciably in the test boring holes. The laboratory tests showed that the surface soil along the roadway is extremely expansive, highly plastic and capable of creep under sustained load and appropriate moisture conditions. The report concluded that the proposed extension was feasible to construct. While the laboratory tests indicated that the soil beneath the proposed road had strengths no greater than the soil in the Boulder Drive area, the report stated that movement similar to that which occurred on Boulder Drive was less likely to occur due to the relatively flat gradient. It did state, however, that because the road would be built primarily on an old slide mass, slow downhill movement will occur along most of the *102 roadway. The report cautioned that the study did not include an analysis of the possible effects that development of the adjacent lands might have on the roadway. The concern was that the additional water which might be introduced into the hillside as a result of development might cause serious damage to the road. Accordingly, the report strongly recommended that no construction be allowed on the land adjacent to the roadway until an overall regional study was completed which would determine the affect of land development on the stability of both the roadway and the Highlands area. The City of San Jose approved the extension of Suncrest Avenue on May 25, 1970. Construction was begun in the summer of 1970 and the roadway was completed on January 6, 1971. The total cost of construction, which was financed by the city, was $550,000. A landslide occurs when the pull of gravity on earth materials overcomes their frictional resistance to downslope movement. Basically, slope stability is affected by (1) type and structural properties of earth materials; (2) steepness of slopes; (3) water--a landslide area has a greater tendency to move when it is wet due to the heavier weight of the *103 material; (4) ground shaking; (5) type of vegetation; and (6) proximity to areas under-going active erosion. Most landsliding takes place in areas where landsliding has occurred before, and old landslide deposits are commonly reactivated by either natural or artificial means. The materials that form landslide deposits may be so broken up and disturbed that landsliding may easily recur, especially if slope angles or moisture contents are changed. A fault is a fracture in the earth's crust whereby one side is moving with respect to the other side. Thus, a landslide area transversed by a fault is more unstable than a landslide area by itself. The Quimby fault and the Crosley fault, which was unknown in 1969, run through the subject property. Although there has not been any activity which has been recorded in recent times, there is reason to believe that these two faults are potentially active and could be the sites of earthquake activity in the future. In addition, the subject property is located close to the three most active faults in northern California--adjacent to the Hayward Fault, within three miles of the Calaveras Fault, and approximately 14 miles away from the San Andreas *104 Fault. The fault zones and landslides in the area of the subject property were first mapped in the late 1940's by M. D. Crittenden. Overall, the subject property is located in one of the most seismically active regions in the United States. In the fall of 1964, construction was begun on the South Bay Aqueduct Terminal Facilities (Terminal Facilities) for the Department of Water Resources, State of California. The site of the Terminal Facilities is bordered on the north by the Sunset Hills property. The site is located on the lower end of a hill and the property sloped northward from an elevation of 450 feet to 500 feet. The total excavation required to prepare the sit for construction resulted in the removal of 15,907 cubic yards of material. On October 21, 1964, during the time when the horizontal water drain holes were being drilling into the hill, several cracks and a slight bulge were noticed in the cut slope indicating that the slope above the reservoir site was failing. On November 4, 1964, cracks were first noticed above the top of the cut and on November 10 several large cracks were discovered on the subject property about 100 feet back from the top of the cut along with *105 many smaller cracks. By this time, it was concluded that a landslide of potentially hazardous proportions was developing. It was then decided that a number of holes would be drilled in which slope indicator casing would be installed to detect any movement and that additional excavation would be planned to stabilize the slide. In January 1965, the slope indicator and surface survey data was compiled and the results were as follows: (1) the incipient slide was a rotational failure extending into the floor of the tank site excavation; (2) only a small portion of the north side of the tank lay on the toe of slide; (3) no large slide extended completely under the tank site; (4) movement was occurring in a discontinuous but persistent fashion in different segments of the slide mass; (5) the slide measured 350 feet long, 220 feet wide, and approximately 50 feet deep at the maximum points. The slide volume was estimated to be 53,000 cubic yards. Based on this information a remedial excavation designed to stabilize the slide and protect the reservoir tank was completed on March 12, 1965. Thereafter, the slope movement, although still continuing in a southerly direction, was reduced to *106 a rate of between one-half to three inches per year as of June 1966. The reservoir tank was not considered to be in any imminent danger from the landslide due to the remedial excavation and the fact that only a portion of the tank was located on the toe, which is the lowest part of the landslide. In fact, the construction of a massive structure, such as a water tank, on the toe of a landslide will actually tend to stabilize the movement of a landslide whereas any construction on the upper part of a landslide would accentuate the movement. In order to protect the tank in the future, the project geologist in June 1966 made a number of recommendations which include a regular maintenance program and a continuous inspection and monitoring program of slope movement. There were a number of sales of real property in the vicinity of the Sunset Hills property prior to December 31, 1969, the valuation date of the Sunset Hills property. Three sales were of "ranchette" property, which is a small acreage of property sold not on a per acre basis but as a single lot for a home. Referring to these sales in reverse chronological order, property A consisted of 4.93 acres located on a private road *107 in the foothills of what is called the Hamilton Range, approximately 2 miles southeast of the subject property. It was sold on March 10, 1969, for $25,000 with a loan of $20,000 from the seller to the buyer secured by a first deed of trust on the property. The price per acre was $5,070. Property B was located in the same general neighborhood adjacent to property A on Lazy Lane which is off Aborn Road, in the Evergreen Foothills area. It consisted of 2.45 acres and the sale was made on August 2, 1968. The total sale price was $45,000 of which $32,500 was borrowed from the seller and secured by a first deed of trust on the property. The price per acre was $18,367. The dramatic difference in price between properties A and B was due to the fact that property B had better access roads and was generally a better subdivided ranchette development. Property C was closer to the Sunset Hills property, being located on Sierra Road, adjacent to the north side of the subject property. The parcel was described as being very steep with 800 feet of frontage on Sierra Road and had a total area of 4.328 acres. The date of the sale was April 1, 1966, and the sales price was $26,000. The per acre *108 price was $6,000. The first deed of trust was $22,000 and the grantor, Fred Allred, stated that the price was high because the term of the deed of trust was 10 years. The remaining four sales were of large accessible tracts of land ranging in size from 124 acres to 217 acres. The land was generally unimproved and the terrain was rolling to steep mountain acreage. These parcels were out of the path of immediate growth in San Jose and were zoned A-1-40, which allowed for 40-acre minimum homesites. Basically, these sales represented about the lowest price a buyer would pay for acreage with the potential for subdivision in the future. The price per acre ranged from $924 to $1,000 for two of the parcels to $1,850 per acre for land which also had potential as a surface mine for cinnabar deposits. In June of 1967, the Sunset Hills property served as collateral for a loan made by Palo Alto Savings and Loan Company, a California Savings and Loan, to Edwin C. and Helen V. Johnsen. An appraisal report with a stated date of appraisal of June 1, 1967, showed approval by the loans committee of the loan as of June 19, 1969, and valued the 43-acre tract at $4,000 per acre for a total fair market *109 value of $172,000. The report merely states the valuation with no explanation or supporting data. The loan was made on June 22, 1967, and the total amount of the loan was $60,000. The Sunset Hills property was assessed in 1969 at $62,620 for state real estate tax purposes and the total taxes paid for 1969-70 were $8,347.42. In California, real estate valuation is based on a market comparison approach. In 1969 assessed values of properties in California were at approximately 25 percent of the assessor's determination of fair market value. On its partnership return for the years here in issue SSH claimed the following deductions which produced the resulting distributable losses in each of the years, which deductions and losses were disallowed by respondent: Partnership
Year
Deduction
Loss
1969
Interest Expense
$30,000.00
$30,035.00
Bank Charge
35.00
1970
Interest Expense
15,805.92
31,106.87
Taxes
14,361.25
Other Expenses
939.70
1971
Interest Expense
42,666.38
57,078.15
Taxes
12,469.22
Repairs and
maintenance
958.00
Other Expenses
984.55
1972
Miscellaneous
expenses
27.15
27.15 Respondent, in the notices of deficiency to each of petitioners disallowed the losses claimed by that petitioner as distributable losses *110 from the SSH partnership. At trial, the parties agreed to a method of computing the losses sustained by the SSH partnership based on a formula which requires as part thereof our determination of the fair market value of the Sunset Hills property as of December 31, 1969, the date on which the property was acquired by SSH. ULTIMATE FINDING OF FACT The fair market value of the Sunset Hills property on December 31, 1969, was $112,000. OPINION Due to the concessions made by the parties, the only issue presented for our determination is the fair market value of the Sunset Hills property as of December 31, 1969. The fair market value of property is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." Section 1.170A-(1)(c)(2), Income Tax Regs.; McShain v. Commissioner, 71 T.C. 998, 1004 (1979). The fair market value of property at any given date is a question of fact to be decided on the basis of all the evidence and no set rules, methods or formulas are controlling. Newaygo Portland Cement Co. v. Commissioner, 27 B.T.A. 1097, 1106 (1933), *111 affd. 77 F.2d 536 (D.C. Cir. 1935). Petitioners' expert witness was a developer who was familiar with the Sunset Hills property and who held a real estate broker's license. He did not have any other special qualifications which would have aided him in formulating his opinion of the value of the subject property and he did not submit a written report of his appraisal. In valuing an undeveloped piece of property, unlike other developers who would consider the price of similar acreage in the vicinity, petitioners' expert stated that he projects what the end product--meaning the residence and the land--will sell for and then subtracts out his building costs and profit to arrive at what he could pay for the land. He testified as to the costs of construction and the square footage of the homes that he would have built on the subject property in 1964 and 1980. Using these two periods as reference points, he stated that he would have built a 1,700 square foot house in 1969 and that the subject property would have yielded 70 lots or somewhat less than 2 lots to an acre. He testified that he could afford to pay $7,600 an acre and still make a profit on each of the 70 homes he sold, which *112 would list for $27,000 to $28,000. Broken down into its component parts, he stated that each finished lot would cost $10,000, $3,800 for the raw land and about $6,200 for improvements, and a 1,700 square foot residence would cost approximately $12,000 to $13,000 to construct and the balance of the sale price would be his profit. Relying on this analysis, petitioners argued that this estimate of $7,600 per acre supports their contention that the Sunset Hills property was worth $298,502.55 on December 31, 1969. Respondent presented two expert witnesses, one to establish the geological condition of the property and the other to offer an appraisal of the fair market value. Respondent's expert witness on valuation had good credentials, was familiar with the area and submitted a written report containing his findings. He used two different approaches in attempting to value the subject property. First, he prepared a hypothetical subdivision of the property which consisted of seven "ranchette" homesites which varied in size from three to four-and-one-half acres each. He selected this density because he felt it would be acceptable to the city in 1969. Five of these lots, as drawn by the *113 witness, bordered on the proposed location of the Suncrest Avenue extension, which, for the purposes of his analysis, he assumed would be completed. Based on the sales of comparable ranchettes in the foothills of San Jose, respondent's expert concluded that these seven ranchettes could be sold for $25,000 each. He then projected the costs of development which would be required to convert the raw land into ranchette homesites. These costs included expenditures for grading, paving, utilities and water of $153,000 and $63,750 for engineering and soils, overhead, sales expense and developer's profit for a total of $216,750. Thus, the expenses would exceed the projected income of $175,000 by a substantial amount and his conclusion was that a subdivision based on this lower density was simply uneconomical. In addition, he stated that this analysis did not take into account the extensive soil problems that were evident on the subject property. Respondent's expert's second method of valuation was a comparison of sales of comparable large parcels of raw land which were not in the path of immediate growth but which could be subdivided at a future date. These sales, which carried an average *114 price of approximately $1,000 per acre, represented the lowest price an investor/developer would pay for acreage with the potential for higher use in the future. Because of the significant geological problems, it was his opinion that the subject property was only suitable for future higher use and that therefore the property was only worth $1,000 an acre or a total value of $41,000. In our view there are fallacies in the bases of the opinions of both experts. Petitioners' expert stated that he could pay $7,600 an acre if the parcel would yield 70 lots. In fact, the prospect of city approval of a 70-lot density, which approval would have been necessary in 1969 because no tentative or final plans had been approved at that time, was slim at that time due to a number of factors. First, substantial damage had occurred in the Highlands, where the soil conditions were substantially similar to those in Sunset Hills, and there was testimony to the effect that the city would be reluctant to approve a similar development at that time. Second, the report on the feasibility of the extension of Suncrest Avenue through the subject property expressly warned that development on the lands adjacent *115 to the proposed roadway should not be permitted until the completion of an overall regional study which would analyze the stability of the entire area. In addition, respondent's expert geologist, who had first studied the area in 1947, testified that if the city asked him whether he would approve the construction of single family residences on the subject property, he would only recommend development on the northwest corner and then only after an extensive evaluation of the soil and the types of foundations and structures which would compensate for the known problems in the area. On the other hand, respondent's expert concluded that the Sunset Hills property was not developable in the near future and therefore it was worth only the lowest amount paid for raw land in the area, namely $1,000 per acre. He testified that the subject property could be subdivided into seven ranchette lots ranging in size from three to five acres with all but two lots bordering on the proposed Suncrest Avenue extension. Given the geological problems associated with the area, he felt that this lower density would be more "palatable" to the city and that such a plan would be approved. Based on comparable *116 sales in the area, he stated that a reasonable price would be $25,000 each for the seven ranchettes. Respondent's expert concluded that the subdivision of the property utilizing this lower density would be uneconomical due to the substantial direct and indirect development costs. However, in projecting these costs he failed to take into account the fact that the city was planning in 1969 to build the Suncrest Avenue extension across the subject property at its own expense. In fact, the city spent approximately $550,000 in constructing the roadway. Furthermore, the subject property was not "out of the path of immediate growth" like the isolated parcels selling for $1,000 an acre, but was in the middle of a large development with homes to the east and the west. In view of all the facts and circumstances and using our best judgment, we find that the fair market value of the Sunset Hills property on December 31, 1969, was $112,000. Both valuation experts testified that it was reasonable to assume in 1969 that the Suncrest Avenue extension would be completed in the immediate future and that it would bisect the subject property. Respondent's expert also stated that it was his opinion *117 that the city would approve the subdivision of the subject property into five-acre ranchette homesites and that, based on comparable sales in the area, these sites could be sold for $25,000 each. Based on respondent's expert's proposed subdivision map, we conclude that the property could economically yield five ranchette lots bordering on Suncrest Avenue. We conclude that it was not feasible in 1969 to develop the approximately 12 acres of Sunset Hills remaining after deducting the acreage of the ranchetts lots and the 2.5 acres deeded to the city for the construction of the Suncrest Avenue extension and the grant of easement to the city totalling 1.4 acres. We also conclude that on December 31, 1969, it was not reasonable to anticipate that these 12 acres could be developed in the near future. Therefore we accept respondent's expert's minimal value of $1,000 per acre for this 12-acre property. This gross value of $137,000 must then be reduced for the cost of the geological studies which both experts agreed would be required if ranchette lots were to be sold, the expenditure that would be required for some grading to give the ranchettes access to Suncrest Avenue, the cost of bringing *118 water and utilities to the property and selling expenses. In addition, the value of the property must be discounted to some extent for the fact that the Suncrest Avenue extension was not completed as of December 31, 1969, and completion was expected to and did take a year after December 31, 1969, the valuation date of Sunset Hills. The record shows that water and utilities were reasonably close to the property. We conclude from the record as a whole that $25,000 is a reasonable allowance at December 31, 1969, for these expenditures. Petitioners argue that the best evidence that the fair market value of the Sunset Hills property was $298,502.55 was the actual purchase price of the property on December 31, 1969, and the subsequent sale price on December 14, 1971. The price paid for a piece of property sold in an arm's length transaction is persuasive evidence of its actual fair market value. However, the purchase of the subject property by SSH was made from ABC, a Bahamian trust company, which, after the contract with SSH had been signed, acquired the subject property from Santa Clara Investors, a partnership consisting of investors represented in part by Harry Margolis. The sale *119 of the Sunset Hills property was made to ADC, a California corporation whose stock was owned 50 percent by Harry Margolis and 50 percent by an employee of Mr. Margolis. In light of the foregoing, we conclude that these purchases and sales were not arm's length transactions and therefore the value assigned to the property by the parties is not reliable evidence of the fair market value of the property. See Narver v. Commissioner, 75 T.C.     (Oct. 9, 1980). Petitioners further argue that weight should be given to the valuation of the property on behalf of the Palo Alto Savings and Loan Association as of June 1967. Considering the fact that the basis of this valuation is not shown and the indication that the valuation was not actually made until 1969, we consider this valuation to be of little weight. We have, in considering the evidence as a whole, considered the fact that the Palo Alto Savings and Loan Association made a loan of $60,000 in 1967, secured by the Sunset Hills property. Based on our finding that the fair market value of the property was $112,000, and pursuant to the stipulation of the parties, the deductions claimed by SSH must be multiplied by a fraction, the numerator *120 of which will be $284,720 plus $112,000 or $396,720 and the denominator of which will be $583,223. Decision will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: William G. Smith and Carol K. Smith, docket Nos. 5999-72, 3850-74, and 5668-76; Neil M. Herring and Ethel Herring, docket Nos. 6854-72, 4015-74, and 5671-76; Sol Scope and Nina Scope, docket Nos. 3862-74 and 5799-76.↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect in the years in issue.↩