ESTATE OF DONALD V. MURPHY, By Donald V. Murphy, Jr., John D. Murphy, and Mary F. Holland, Administrators, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Murphy v. Commissioner
Docket No. 3730-77.
United States Tax Court
T.C. Memo 1981-489; 1981 Tax Ct. Memo LEXIS 251; 42 T.C.M. (CCH) 1010; T.C.M. (RIA) 81489; September 9, 1981. *251 Held: the date-of-death fair market values of two parcels of real estate determined. Harrison V. Williams, Jr., for the petitioner. Barry J. Finkelstein, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $ 281,052.90. After concessions by the parties on other issues, the issues remaining for decision are the determinations of the fair market values of two parcels of real estate includible in decedent's gross estate. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the petition in this case was filed, petitioner was a legal resident of *252 Syracuse, New York. Decedent, Donald V. Murphy, died intestate on August 19, 1973. Among the properties included in decedent's gross estate and reported on petitioner's Federal estate tax return were two parcels of real estate in Syracuse, New York. One parcel is at 601-607 South Warren Street, 609-615 South Warren Street, and 210 Harrison Street. (This property is hereinafter sometimes referred to as "the Warren Property".) The other parcel is at 345-367 East Onondaga Street and 324 East Fayette Street. (This property is hereinafter sometimes referred to as "the OnondagaProperty". The Warren Property and the OnondagaProperty are hereinafter sometimes referred to collectively as "the subject properties".) The Warren Property
The Warren Property is a rectangular lot with an area of about 12,540 square feet. It is used as a parking lot. It has frontages on South Warren Street and on Harrison Place of about 95 feet and frontage on Harrison Street of about 132 feet. Harrison Place parallels South Warren Street, runs in a southerly direction from Harrison Street, and is about 46 feet wide. South Warren Street and Harrison Street are each 66 feet wide, the former being one-way *253 north and the latter being one-way west. All bounding streets are paved with stone curbing. The Warren Property is surfaced by an asphalticbase paving; it is surrounded by a four-foot link fence, except for access curb cuts on Harrison Place, South Warren Street, and Harrison Street. A small shelter for attendants is near the South Warren Street access. All public utilities are available. The Warren Property is zoned "Central Business District, Offices and Services, Restricted." [1] The appraised value of the Warren property for real estate tax purposes for 1973 was $ 70,500 (about $ 5.62 per square foot). The character of the neighborhood surrounding the Warren Property is predominantly business-commercial offices, banks, and regional department stores--with *254 some residential apartment dwellings. North across Harrison Street from the Warren Property is the Mony Plaza office building and parking garage. The Mony Plaza opened in 1967; it is a twenty-story, 300,000-square-foot office tower, with a five-story annex and a parking garage. Also north across Harrison Street and next to the Mony Plaza is the Carrier Tower. The Mony Plaza and the Carrier Tower are the two most important office buildings in downtown Syracuse. On the northwest corner of Harrison and South Warren Streets, catercorner from the Warren Property, is the Hotel Syracuse. The Chimes Building, a twelve-story office building, is at 500 South Salina Street, about 450 feet west of the Warren Property. The Red Cross Building is at 630-634 South Warren Street, across the street from, and half a block south of, the Warren Property. Two department stores (Sibley's and Dey Brothers) and another office building (the 499 Office Building) are within 1,000 feet of the Warren Property.
The highest and best use for the Warren Property is as a commercial parking lot with some potential for commercial development. Decedent bought the Warren Property from the Astor Estate on May 26, 1966, for *255 $ 275,000 (about $ 22 per square foot). On March 30, 1966, decedent signed a lease to rent other property from the Astor Estate, commencing June 1, 1966. The lease was for a month-to-month tenancy, terminable at will. On April 10, 1972, decedent listed the Warren Property with a real estate company for sale at a price of $ 300,000, which remained the offering price through 1973.There were no purchasers at that price. On June 28, 1977, the listed price for the Warren Property was reduced from $ 300,000 to $ 130,000. During 1973, the Warren Property was leased by petitioner to a corporation controlled by members of the Murphy family for $ 17,000 per year. The OnondagaProperty
The OnondagaProperty is an irregularly shaped twelve-sided lot with an area of more than 37,000 square feet. It is used as a parking lot. It has frontages of almost 162 feet on East Onondaga Street and 63 feet on East Fayette Street. Both of these streets are 66 feet wide and paved with curbing, the latter being a two-way street and the former being one-way southwestbound. The OnondagaProperty is surfaced by an asphaltic-base paving and is partially fenced with chain link fencing. It has a *256 small office booth for attendants. All public utilities are available. The OnondagaProperty is zoned "Central Business District, Offices and Services." (See note 1, supra.) The appraised value of the OnondagaProperty for real estate tax purposes for 1973 was $ 85,200 (about $ 2.30 per square foot). The OnondagaProperty is located in the business district of Syracuse; it is just west of the juncture of three major city streets--East Genesee, South State, and East Onondaga--and about 3-1/2 blocks southeast of Clinton Square. The character of the neighborhood may generally be classified as office, with two large New York Telephone Company office and equipment buildings to the north and northeast; attorneys' offices and City offices to the west; a church, a Y.W.C.A., and the Monroe Abstract Office Building to the southwest; and a block away, St. Mary's Circle, the Public Library, and the Onondaga County Court House. The block east of the OnondagaProperty accommodates a rental office building, the Utica Mutual Insurance Company, and the Syracuse Boys Club; immediately to the north of this block is Lafayette Park. The highest and best use for the OnondagaProperty is as *257 a commercial parking lot with some potential for commercial or business develoment.
Decedent bought the OnondagaProperty on June 3, 1969, for $ 333,000 (about $ 9 per square foot). The OnondagaProperty was leased at an annual rate of $ 25,200 at the time an appraisal was made for reporting value on the estate tax return. General Conditions
Both of the subject properties are in downtown Syracuse. The Warren Property is within the area of the Downtown One Urban Renewal Project. The value of real estate in the central business district of Syracuse was on a downward trend during the period 1969-1973. The median price of real estate sold in downtown Syracuse was $ 18 per square foot during the period 1964-1966; $ 10 per square foot during the period 1966-1970; and $ 8 per square foot during the period 1970-1976. During 1969 through 1973, a number of large retail stores closed, went bankrupt, or were vacant. By 1973, few large department stores remained in the downtown area. During 1969 through 1973, the following construction took place in the downtown area: Sibley's Department Store and Parking Garage, the Herald Co. Publicshing Plant, two New York Telephone Company buildings, *258 the Mony Plaza-Carrier Tower complex, the Lincoln First Bank Tower, and the Marine Midland bank and Office Tower (together with its parking garage). Many of the land transactions in the downtown area during the late 1960's and early 1970's involved the Syracuse Urban Renewal Agency (hereinafter referred to as "the Agency"). The Agency was paying an average of $ 16.06 per square foot for property in the area during 1973. Sales to the Agency were forced sales in that the sellers faced the alternative of condemnation. At times the Agency paid more than fair market value for properties in order to fully compensate the sellers. In contrast, the Agency often resold the land at discounted prices, in part because of restraints placed on development of the property, the limited market, and the Agency's purpose to encourage development in the urban areas rather than suburban areas where prices for land were lower. During 1973, the Agency was asking from $ 4 to $ 9 per square foot for downtown property. In 1978, the Agency was asking from $ 2.50 to $ 7.50 per square foot. There have been very few sales of the Agency's acquisitions in the Downtown One Urban Renewal Project. Because of *259 (1) the poor economic climate of the downtown area and (2) the Agency's problems in selling its properties and getting funding, the Agency curtailed its acquisition program in early 1974. The Agency notified petitioner in writing on April 19, 1974, that, based on a marketneeds study of the downtown business area which determined the market was not sufficient to justify any further acquisition and clearance of properties within the Downtown One Urban Renewal Project, petitioner's properties within the project area would not be acquired.
From 1960 to 1970, the population of Syracuse dropped by 8.7 percent. From 1970 to 1976, the population of Syracuse dropped by 14 percent and retail sales dropped by 9.7 percent. One office building downtown was only 30-percent occupied in 1973. The date-of-death fair market values (and approximate values per square foot) of the subject properties, as (1) shown by petitioner on its estate tax return, (2) determined by respondent in the notice of deficiency, and (3) found by the Court, are set forth in table 1. Table 1 The Warren
The Onondaga
Property
Property
Petitioner--tax return
$ 150,500 ($ 12)
[2] $ 399,000 ($ 11)
Respondent--notice of
315,500 ( 25)
745,000 ( 20)
deficiency
Found by the Court
215,000 ( 17)
410,000 ( 11)
*260 OPINION The value of decedent's gross estate includes, under section 2031(a) [3] of the Internal Revenue Code of 1954, the fair market values of the subject properties. Section 20.2031-1(b), Estate Tax Regs. The issues presented for decision are the amounts of the fair market values of the subject properties as of August 19, 1973. The parties' positions and our holdings are set forth in table 1, supra. Generally, the fair market value of property is the price at which a willing buyer will purchase from a willing seller, *261 when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. E.g., McShain v. Commissioner, 71 T.C. 998, 1004 (1979). Respondent's determinations in the notice of deficiency as to the fair market values of the subject properties are presumptively correct, and petitioner bears the burden of proving lower values. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.
At trial, both parties presented the testimony of expert witnesses to establish the fair market values of the subject properties. Petitioner's first expert witness, Hawley Van Swall (hereinafter sometimes referred to as "Van Swall") had originally been hired by respondent to appraise the subject properties. In 1969, Van Swall had appraised another property--the Yates Hotel--in downtown Syracuse.In the course of that appraisal, Van Swall had considered the Warren Property to be worth $ 22 per square foot and observed that the purchase price paid by decedent for the OnondagaProperty in 1969 (about $ 9 *262 per square foot) was unrealistically low and should not be considered in valuing the Yates Hotel in 1969. Van Swall resigned from the appraisal of the subject properties when he learned what the reported values of the subject properties on the estate tax return were.He testified that, in his opinion, the 1973 fair market values reported on petitioner's estate tax return were "fair".However, he did not formally appraise the subject properties and did not prepare an appraisal report on them. Petitioner's second expert witness, Paul W. Gallagher (hereinafter sometimes referred to as "Gallagher"), is an independent fee appraiser and consultant. He had previously been employed for 30 years by the Merchants National Bank and Trust Company of Syracuse as an appraiser, appraisal reviewer, mortgage loan officer, and senior vice president. He appraised eight properties owned by decedent in connection with the preparation of the estate tax return, including the subject properties. In his appraisal report, he used a market data approach to calculate fair market values for the subject properties. He ascertained the relevant characteristics of the subject properties and the surrounding neighborhoods, *263 and analyzed the regional, city, and downtown market conditions.He analyzed other sales and offers of sale in the area. Gallagher concluded that a reasonable value as of August 19, 1973, for the Warren Property was $ 150,000 and for the OnondagaProperty was $ 399,000. Petitioner's third expert witness, Robert P. Flood (hereinafter sometimes referred to as "Flood") is an appraiser and a consultant in real estate and economics. He has been engaged in the real estate business since 1946. He holds a real estate broker's license. He appraised the subject properties and prepared an appraisal report dated December 9, 1977. In his report, he used a market data approach to calculate fair market values for the subject properties.He ascertained the relevant characteristics of the subject properties, assessed the character of the neighborhoods, and analyzed and adjusted sales, contracts of sale, and offers of sale which he considered to be comparable. He concluded that a reasonable value as of August 19, 1973, for the Warren Property was $ 120,000 and for the OnondagaProperty was $ 318,000. Respondent's expert witness, Bernard LaVine (hereinafter sometimes referred to as "LaVine"), *264 is a licensed real estate broker and real estate appraiser and has been engaged in the real estate business since 1948. He appraised the subject properties and prepared appraisal reports dated February 19, 1977. LaVine used a market data method of valuation. He analyzed the relevant characteristics of the properties and the surrounding neighborhoods and considered, in general, the market conditions in downtown Syracuse. He analyzed other real estate sales in the area which he considered comparable as adjusted. He concluded that as of August 19, 1973, the fair market value of the Warren Property was $ 313,500 and the fair market value of the OnondagaProperty was $ 744,500. The market data approach used by Flood, LaVine, and Gallagher generally involved locating parcels of land which were as physically similar as possible to one or the other of the subject properties, and which had been sold within a reasonable time of August 19, 1973. Since no two sales and no two parcels are identical, the actual sales price in each case was then adjusted up or down to reflect the differences between the subject property and the comparable property. The estimated values of the comparable *265 properties as so adjusted provide an indication of the value of the subject property on the relevant date. Like most valuation techniques, this method is far from an exact science. However, it is based upon the common sense approach of taking the actual sales prices of properties similar to the subject properties and then relating these prices to the subject properties.This Court has often used this valuation method.See Wolfsen Land & Cattle Company v. Commissioner, 72 T.C. 1, 18-21 (1979). We have carefully evaluated all of the opinions, other exhibits, and testimony on direct and cross examination of petitioner's experts and respondent's expert. Both parties have spent a great amount of time and effort criticizing the opposition's evidence. Much of the criticism has been valid. Doing the best we can with the data presented by the parties, and gleaning what we can from the experts' conflicting analyses, we have arrived at the conclusions set forth in our Findings of Fact on the last line of table 1, supra. We discuss infra our reasons for these conclusions. *266 The Warren Property
On the estate tax return, petitioner reported the fair market value of the Warren Property as $ 150,500 (about $ 12 per square foot). Respondent asserts the fair market value was $ 315,500 (about $ 25 per square foot). Both figures were derived by use of a market data approach. Flood, also using the market data approach, appraised the property at $ 120,000 (about $ 9.50 per square foot). We are convinced from our evaluation of the expert testimony and appraisal reports that the fair market value of the Warren Property was more than $ 12 per square foot. We conclude this for several reasons. First, the Warren Property is in a prime location in downtown Syracuse. It is located across the street from the Mony Plaza and the Carrier Tower, the two most important office buildings in downtown Syracuse. Second, the Warren Property was purchased on May 26, 1966, for $ 275,000 (about $ 22 per square foot).Respondent relies primarily on this fact for his valuation. We agree with respondent that it is unlikely that during the period 1966 to 1973 the Warren Property's value declined from $ 22 to $ 12 per square foot. Petitioner asserts that the $ 275,000 *267 purchase price was inflated because it included an amount paid for a lease of a parking lot on a nearby parcel of land. However, petitioner has failed to prove this was the case. The only evidence that this was a package transaction is an attorney's bill covering services in connection with both the purchase and the lease, and a copy of the lease dated March 30, 1966. The attorney billing for the two transactions at once does not lead us to conclude that any part of the Warren Property purchase price is properly allocable to the lease. Furthermore, the lease was for a month-to-month tenancy, which would lead us to believe that it is unlikely that any significant consideration beyond the monthly payments would be given for the lease. Third, the Warren Property is a rectangular plot, not irregular in shape, with frontage along three downtown streets. Fourth, we are not impressed by many of petitioner's experts' comparables.Many involve sales in which the Agency is purchaser or seller. The parties seem to agree that such sales prices are distorted. Gallagher admits that he relied on sales by the Agency and did not consider acquisition prices paid by the Agency. Many of the comparables *268 are not located very near the Warren Property. Some of the comparables were sold at a time far removed from August 19, 1973. Fifth, petitioner's expert witness, Gallagher, admits that some comparables, as adjusted for variations from the Warren Property, exceed $ 15 per square foot in fair market value. For example, an irregular lot at 233 East Onondaga Street, near the Warren Property, was sold on October 31, 1972, for $ 18.56 per square foot. Respondent's witness adjusted this purchase price for variations and concluded it was comparable at a value of $ 24.50 per square foot. Petitioner's expert, Gallagher, adjusted the price of yield a comparable of $ 15.22 per square foot. Sixth, we note that the appraised value for real estate tax purposes of the Warren Property was about $ 5.62 per square foot whereas it was only about $ 2.30 per square foot for the OnondagaProperty. This suggests the value per square foot of the Warren Property is substantially more that that of the OnondagaProperty. However, we also conclude that petitioner has proven that respondent's determination of fair market value at $ 25 per square foot is too high. A number of factors lead us to this conclusion. *269 First, a year before his death, decedent listed the Warren Property for sale at $ 300,000 (just under $ 24 per square foot). It remained unsold at that price at decedent's death and for four years thereafter. Clearly, the market valued this property so far below $ 24 per square foot that neither decedent nor petitioner could negotiate a sale while that was the asking price. Second, the Warren Property has been used as a parking lot. The prospect for its commercial development in 1973 was doubtful, because of the downtown market conditions at the time. The value of real estate in the downtown area at the time was declining; retail stores were experiencing financial trouble in their downtown locations; and there was already an excess of office building space. There is even some question as to whether the Warren Property could be used successfully for commercial dvelopment because of its small size. Even respondent's expert witness admits there has been a decline in the population of Syracuse over the period involved. Third, although it is agreed that sales by the Agency are not comparable, we agree with petitioner that the fact that the Agency was selling downtown property *270 for from $ 4 to $ 9 per square foot would depress downtown market prices for real estate in general. In June 1973, the Agency bought and sold a parking lot for approximately $ 4 a square foot. In 1972, another parking lot was bought by the Agency for $ 14.20 per square foot and sold for $ 8 per square foot.This sort of available parking lot space at low prices supports a lower value for the Warren Property. Fourth, some of the sales that petitioner's experts used are helpful in determining value. One property noted by Gallagher had been listed for sale since 1969 at the time of Gallagher's report for $ 19.80 per square foot. This property is a paved parking lot in a good location with 17,424 square feet. We do not know whether this property was subsequently sold, but the fact that it was listed at $ 19.80 per square foot for more than four years suggests that the Warren Property, which is very similar, was not worth more than $ 19.80 per square foot. Fifth, LaVine relies on decedent's 1966 purchase of the Warren Property itself as a comparable, adjusting it upward (to $ 26.75 per square foot) by 22 percent for time. We are persuaded, however, that the trend in prices over *271 this period was downward not upward. We hold, after careful consideration of all the evidence presented, that the fair market value of the Warren Property on August 19, 1973, was $ 215,000 (about $ 17 per square foot). The OnondagaProperty
On the estate tax return, petitioner reported the fair market value of the OnondagaProperty as $ 399,000 (about $ 11 per square foot). Respondent asserts that the fair market value was $ 745,000 (about $ 20 per square foot). The $ 11 valuation was derived by Gallagher through a combined market data approach and income approach.He valued the property at $ 13 per square foot using the market data approach and $ 5.83 per square foot using the income approach. Gallagher reduced the $ 13 per square foot value to $ 11 for two reasons: (1) the substantially lower value derived by use of the income method and (2) "the impracticability at this time of projecting alternate highest and best uses-for office construction, because of the oversupply in the city, - for retail stores because of current vacancies in prime locations and the planned closing of three of five local downtown department stores, - or for apartments, because of recent completion *272 and occupancy of low and middle income accommodations within a few blocks of subject; inadequate plottage; too high land cost for housing." LaVine used only a market data approach. He disagrees with Gallagher's assertion that the two factors above should reduce the value.Flood also appraised the property, using the market data approach, at $ 318,000 (about $ 8.50 per square foot). We are convinced from our evaluation of the expert testimony and appraisal reports that petitioner has satisfied its burden of proving that the fair market value of the OnondagaProperty was about $ 11 per square foot on August 19, 1973. The OnondagaProperty is a very irregularly shaped parcel of land. It was a parking lot and the parties agree that its then current highest and best use was as a parking lot. Despite this concession, respondent's expert did not use an income approach in his appraisal. We believe that petitioner's expert, Gallagher, appropriately considered the depressing effect on fair market value of the relatively limited income-producing capacity of a parking lot. Decedent bought the OnondagaProperty on June 3, 1969, for about $ 9 per square foot. Considering the decline in *273 local real estate values during the period 1969 through 1973, we are convinced the value did not increase to $ 20 per square foot (respondent's asserted value), which would be an increase of more than 122 percent over the four-year period. The sales LaVine considered to be comparable are questionable when decedent's 1969 purchase is considered.LaVine analyzed the sales of three properties. One of these sales was of a lot which was sold for $ 19.20 per square foot on December 12, 1966, about two and one-half years before decedent's purchase of the OnondagaProperty. LaVine then adjusted this purchase price upward by 20 percent for time (3 percent a year) resulting in a comparable of $ 23.04. We note that, if the price of that asserted comparable had been adjusted for time from December 12, 1966, to June 3, 1969 (using LaVine's rate), then there would have been an adjustment of approximately 7-1/2 percent or an adjusted price of $ 20.64 per square foot as of June 3, 1969. We reject as a comparable property with an adjusted value of $ 20.64 per square foot at June 3, 1969, when the actual property in dispute sold on that same date for only about $ 9 per square foot. Respondent *274 asserts the price paid by decedent for the OnondagaProperty was an "unrealistically low" price, and so refuses to use decedent's purchase as a comparable. Respondent attributes the unrealistically low price to decedent's "shrewd investment capabilities". It may very well be that decedent negotiated a favorable purchase price in 1969 for the OnondagaProperty. If we were to apply LaVine's time adjustment analysis (i.e., three percent per year) to his $ 25-per-squarefoot valuation as of August 19, 1973, it would appear that LaVine implicitly considered the OnondagaProperty to be worth more than $ 22 per square foot as of June 3, 1969. Even in light of the comment about decedent's shrewdness as a real estate invester, we find nothing in the record to justify the conclusion that decedent was able to buy property for about $ 9 per square foot at a time when that property's fair market value was $ 22 per square foot. Respondent relies on some of the comments made by Van Swall in his 1969 appraisal. He emphasizes Van Swall's reference in his report to the price of decedent's 1969 acquisition of the OnondagaProperty as being unrealistically low. We do not believe this comment is determinative, *275 especially in view of Van Swall's opinion expressed at trial. We also decline to accept respondent's suggestion that Van Swall's change of opinion was attributable to some impropriety.Finally, respondent places too much emphasis on Van Swall's statement that "$ 14.90 per sq. ft. would seem to set the bottom of the range at which the subject land would sell assuming a willing buyer and a willing seller." Respondent interprets this to mean that "the bottom range of values of property in downtown Syracuse was $ 14.90 per square foot." We interpret Van Swall's 1969 statement merely to mean that it was Van Swall's opinion that $ 14.90 per square foot was the bottom range of 1969 values of the property Van Swall was then appraising.
We hold, on the basis of the record in the instant case, that petitioner has met its burden of proving that the fair market value of the OnondagaProperty on August 19, 1973, was about $ 11 per square foot. See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). Taking into account petitioner's concession of error as to area (see note 2, supra), we hold that the fair market value of the OnondagaProperty on August 19, 1973, was *276 $ 410,000 (about $ 11 per square foot). To reflect the concessions made by the parties and the conclusions reached herein, Decision will be entered under Rule 155. Footnotes
1. This classification includes offices, business services, sales offices, beauty and barber shops, small appliance repair shops, day care centers, colleges, trade schools, gasoline service stations as auxiliary to parking garages, not to be visible from the exterior, parking lots, etc. The "Restricted" qualification reduces the permitted density of development, in order to protect adjacent residential districts.↩
2. On brief, petitioner concedes that the OnondagaProperty is larger than was indicated on the appraisal report that underlay the estate tax return.↩
3. SEC 2031. DEFINITION OF GROSS ESTATE. (a) General.--The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.↩